No. 45,968

THE STATE HIGHWAY COMMISSION OF KANSAS, *Appellant,* v. H. ALAN LEE, et al., *Appellees.*

(485 P. 2d 310)

Opinion filed May 15, 1971.

*Dana B. Dodderidge*, of Topeka, argued the cause, and *Ronald D. Innes*, of Everett and Innes, of Manhattan, was with him on the brief for the appellant.

*Larry B. McGrath*, of Manhattan, and *Charles D. Green*, of Arthur and Green, of Manhattan, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by the State Highway Commission in an eminent domain proceeding wherein it acquired a right-of-way for highway purposes on two tracts of land owned by the appellees at Manhattan, Kansas.

The points asserted on appeal are confined to rulings of the trial court on the admission and exclusion of evidence in proof of damages in an eminent domain proceeding.

On the 24th day of April, 1968, the State Highway Commission of Kansas (appellant) filed a petition in the district court of Riley County, Kansas, to acquire certain parcels of land in an area northwest of the city of Manhattan for highway right-of-way purposes in order to construct a cloverleaf interchange at the intersection of existing K-113 highway and Kimball Avenue. Included in the parcels taken were parts of two separate tracts owned by H. Alan Lee and his brother, Robert V. Lee, and their respective wives (appellees). One tract, hereafter called the "east tract," was located in the southeast quadrant of the above intersection and contained 10.10 acres before the taking. The other tract, hereafter called the "west tract," was located in the southwest quadrant of the same intersection and contained 16.80 acres before the taking. In the condemnation 4.67 acres were taken from the east tract, leaving a remainder of 5.43 acres, and 4.32 acres were taken from the west tract, leaving a remainder of 12.48 acres.

The court-appointed appraisers awarded $31,000 compensation for the taking in the east tract and $19,575 compensation for the taking in the west tract, making a total of $50,575.

The landowners appealed from the awards on both tracts. Thereafter, the court consolidated the appeals on the two tracts for trial, and the parties stipulated the tracts would be treated as separate

units for valuation purposes, but the awards would be added to obtain the total award. Trial to a jury on March 19 and 20, 1969, resulted in a verdict for the landowners of $85,750.

At the pretrial conference the parties stipulated the date of the taking was June 20, 1968.

Direct access was denied to K-113 highway both before and after the taking. Various exhibits, consisting of maps of the city and the northwest part, including subdivision plats of the two tracts, were admitted in evidence without objection. These exhibits disclosed the two tracts to be irregular in shape, with even more irregularity caused by the taking of the parcels condemned.

At the time of the taking both tracts were zoned residential but had not been annexed to the city. The city limits bordered on three sides of the tracts, all except the north. On the date of the taking there was *no recorded plat* on either tract, and there were no improvements on either tract, merely grass and trees. All expert witnesses agreed the tracts were ideal for residential construction, and this was the highest and best use for the property.

An odd-shaped unimproved tract adjacent to the north part of the east side of the east tract was owned by the First Christian Church. The west tract is bounded on the west by Wreath Avenue which runs in a north-south direction. Just west of Wreath Avenue is Ci-Co (meaning City-County) Park. South of the west tract and adjacent thereto is a 12-acre undeveloped tract owned by the Lundin brothers who are developers in this area. South of the Lundin tract is a new area vocational technical school.

The east tract is bounded on the east by a residential area which was platted and developed by the Lee brothers, appellees herein. It consists of eight additions which had already been platted in the Howenstine Addition. All additions conformed to the master plan developed by the Lees in 1959. Schwab and Eaton, consulting engineers, prepared the master plan. On January 28, 1968, approximately *five months before the taking herein,* the Lees went before the county planning commission with Howenstine Addition No. 9, *the east tract here in question,* and were denied permission to plat the tract which conformed to the 1959 master plan. Platting was denied solely because the state was planning to take more land for a cloverleaf at the intersection here in question. Never had the landowners been refused, nor had they had any trouble of any type in having their previous plats accepted. At the time of taking the

Lees were building in Howenstine Addition No. 7. It was the prac-
tice of the appellees to build houses and sell the house and lot in a
package deal. They seldom sold unimproved lots.

The Lees purchased the two tracts here in question in January,
1966, for $3,600 per acre, and since that time have made no signifi-
cant changes in the property. The 1959 master plan showed 49
potential lots in the west tract and 30 potential lots in the east tract
before the taking. After the taking the Lees platted the remainder
of the east tract as Howenstine Addition No. 9, containing 10
residential lots and streets. They officially filed this plat about a
week before the trial. Also platted after the taking was Howenstine
Addition No. 10, which adjoins the southeast corner of the east tract.
No plat had been officially filed for the west tract at the time of
taking or trial.

The landowners and the State Highway Commission in the trial
of the case each called three expert witnesses. H. Alan Lee, one of
the landowners, also testified as a valuation witness. In his opinion
the total compensation for the taking should be $117,500. The
other expert witnesses for the landowners gave valuation testimony
ranging from $105,000 to $108,000 total compensation for the taking
of the two parcels. The State Highway Commission's expert wit-
nesses gave valuation testimony ranging from $37,950 to $51,595
total compensation for the taking of the two parcels.

There was testimony the development of the tracts of land in
question was imminent not only because of the desirability of the
lots, but because of the growth of Kansas State University, the
establishment of the Grain Marketing Research Laboratory, em-
ploying 200 to 300 people, and the new McCall Pattern Plant,
employing 300 to 400 people, all of which would significantly in-
crease the demand for housing in Manhattan and in the rapidly
developing residential area in the northwestern part of the city.

While the appellant specifies ten points of error on appeal, they
resolve into two basic issues: First, did the trial court err in ex-
cluding evidence of the purchase price paid for the subject land
by the appellees; and second, did the trial court err in admitting
evidence on the value of an undivided tract of land by the income
approach method. The appellant states the second question in the
following language:

"Is it proper to value an unsubdivided acreage tract as though it were
subdivided into lots?"

The foregoing two basic issues were raised by the parties at the pretrial stage of the proceeding. At the first pretrial conference the trial court tentatively indicated what its rulings would be on these questions, but it gave the parties an opportunity to submit briefs. Thereafter a second pretrial conference was conducted, and the court finalized its pretrial order.

The trial court ruled that the purchase price of the two tracts of land in question, purchased by the appellees in January, 1966, for $3,600 per acre, approximately two years and five months prior to the taking, would not be admissible in evidence as a comparable sale.

In so ruling the trial court assigned two basic reasons. It said:

". . . I think the court can take judicial knowledge of the localized conditions, I think which are of general notoriety in the community and that is the northwest part of town has been a rapidly developing area in the last two or three years and that I would say within the past year that a road was constructed from the old U. S. Highway 40 north up toward the dam. [Tuttle Creek Dam and Reservoir.] So I don't feel that what the landowner paid for the land in question in this case is relevant to what the actual market value of that land is. . . ."

The other reason was stated by the trial court in overruling the appellant's motion for a new trial:

". . . But the court felt this, and has always felt that the purchase price of property paid by a landowner, whose property is being condemned by a public authority, that purchase price should not be admitted into evidence for the reason that it raises a collateral issue of how much profit should be awarded this landowner, or did he make a good bargain. . . ."

At the trial the appellant was precluded from cross-examining the appellee, H. Alan Lee, concerning what he paid for the two tracts of land in question. The appellant also offered to prove that both tracts were purchased in January, 1966, for $3,600 an acre, but the court adhered to its prior ruling and refused to admit this evidence.

In its motion for a new trial the appellant alleged abuse of discretion on the part of the trial court in refusing to admit evidence of the purchase price paid for the two tracts in question.

We have been cited to no Kansas cases on the point and our research has not been fruitful.

An extended annotation in 55 A. L. R. 2d 791 discloses other jurisdictions generally hold that evidence of the price paid for condemned real property on a sale prior to the proceedings in which condemnation is sought is generally admissible in such proceed-

ings, where the prior sale is *bona fide*, voluntary, not too remote in point of time, and if conditions of the property and surroundings are sufficiently similar to those on the date of the taking. *Yoder v. City of Hutchinson*, 171 Kan. 1, 10, 228 P. 2d 918, tends to support this rule.

Basically, the admissibility of such evidence is determined by the same rules as are applied to determine the admissibility of evidence pertaining to the purchase price of specific tracts of neighboring land in an effort to establish the fair market value of the tract of land condemned.

Prior to the new code of civil procedure an expert witness was not permitted in a condemnation action to testify on direct examination concerning the purchase price of a specific tract of neighboring land. This was not a proper method to prove the market value of the land subject to condemnation. The rule then was that in condemnation proceedings opinions as to the value of property should be confined to the property in question, unless on cross-examination, for the purpose of testing the knowledge and competency of the expert witness, the value of neighboring land was inquired into. (*Luecke v. State Highway Commission*, 186 Kan. 584, 352 P. 2d 454, and cases cited therein.)

The new procedural act in eminent domain proceedings also became effective January 1, 1964, when the new code of civil procedure became effective. Under the provisions of K. S. A. 1970 Supp. 26-508, an appeal taken from an award in a condemnation action "shall be docketed as a civil action [in the district court] and tried as any other civil action." (The 1968 amendment by the legislature did not change this provision. See K. S. A. 26-508.)

The new code of civil procedure incorporated Article 4, which is the uniform code of evidence, and it is thereby made applicable to the trial of condemnation actions.

Now, under the rules of evidence, K. S. A. 60-401, *et seq.*, an expert witness, on direct examination, may testify as to the purchase price of specific tracts of neighboring land in a condemnation proceeding, provided the evidence is relevant. This was established in *City of Wichita v. Jennings*, 199 Kan. 621, 433 P. 2d 351.

Under K. S. A. 60-407 all evidence is admissible if it is relevant to the issue being investigated. This provision is said to have abolished the exclusionary rules of evidence existing prior to the passage of the new code of civil procedure. In *Jennings* the court said:

"As all exclusionary rules were wiped out and none were reinstated as to the use of the purchase price of a specific tract of neighboring land to prove value, we are forced to conclude that the legislature intended to do away with the exclusion.

"It must be understood, however, that such evidence must present the purchase price of a sale of comparable land which was not so remote as to time and distance as to be irrelevant. The determination of this fact is to be left to the sound discretion of the trial court. Most of such factors go more to the weight to be given the testimony than its admissibility." (p. 625.)

The *Jennings* case clearly suggests that condemnation cases in which exclusionary rules of evidence were applied prior to the passage of the new code of civil procedure are no longer reliable. Therefore, a review of condemnation cases decided prior to January 1, 1964, applying exclusionary rules of evidence on points here asserted, will not be undertaken.

Upon the foregoing authorities the rule to be applied, on the point here under discussion, is that evidence of the price paid for condemned real property on a sale prior to the proceedings in which the condemnation is sought is generally admissible in such proceedings, where the sale is *bona fide*, voluntary, not too remote in time, and if the conditions of the property and surroundings are sufficiently similar to those on the date of the taking. Whether such evidence is relevant depends upon a determination of the foregoing factors which lie within the trial court's discretionary powers.

Thus, whether the purchase price paid for the condemned property in the instant case was so remote in time as to be irrelevant because of changed economic conditions and surroundings is a matter resting within the sound discretion of the trial court. Absent an abuse of the exercise of such power of discretion, the determination made by the trial court will not be set aside. (*Yoder v. City of Hutchinson,* supra.)

In *United States v. 69.67 Acres of Land, Etc.* (E. D. N. Y. 1957) 152 F. Supp. 441, the court in rejecting the purchase price paid only two years prior to the appropriation stated:

"Nor does it seem that reliance should be had upon the purchase price paid for the latter in 1952 of $750 per acre. During the two year interval that elapsed until the taking over, there was opportunity for a considerable increase in value and it is the belief of this Court that such indeed took place. . . ." (p. 444.)

In *Knollman v. United States* (6th Cir. 1954) 214 F. 2d 106, the court stated that it was the trial judge who knows the community,

knows the areas of development, and is able to take judicial notice of expanding city limits.

The appellant contends the property here in question was outside the city limits on the date of the purchase and on the date of the taking, and that it had not been officially platted. Whatever relevance these facts may have in other cases, they have little, if any, relevance to the facts in this case. The landowners, in their natural development of the Howenstine Addition, were ready to begin development of the condemned tract. On January 28, 1968, five months before the taking, they requested the Riley County Planning Commission to accept the plat of the condemned east tract. The plat submitted was identical to the preliminary master plan of the Howenstine Addition that was developed in 1959, just as eight previous plats conformed to the master plan. Only by administrative fiat of the County Planning Commission were the landowners denied platting because the state might want a cloverleaf at the particular intersection in question to handle the traffic from the Kansas State University's new football stadium that was conceived. The new stadium was completed and ready for use in 1968.

The appellant also contends the condemned tracts were unimproved land and located in an area of residential development. It is gleaned from the record that the court took judicial notice of changed conditions concerning which the expert witnesses in the case later testified. All but 5 of the 69 lots in the Keen Addition had been sold by June 20, 1968. All of the 24 lots in the Blue Hills Addition had been sold by June 20, 1968. The 52 lots in Randolph Hills Addition, immediately south of Howenstine Addition, were sold in two and one-half years beginning in September, 1966, through February, 1969. The Westloop Shopping Center located immediately south of the Gaslight Addition consisted of a Dillon grocery store and T G & Y variety store in January, 1966. In June, 1968, there was a large Tempo store, drug store and many small shops which made Westloop a large regional shopping center. There had also been three major apartment complexes constructed creating over 350 living unts. Ci-Co Park, and the K. S. U. football stadium had been constructed. All of the land north and west of the condemned tract had been purchased by land development companies. No property was available to the north of Manhattan for several miles because it was all owned by Kansas State University and used for various purposes, including agricultural experiment station purposes.

The mere fact that the two tracts of land in question were not developed by the Lees prior to the date of the taking does not mean that the character of the land had not changed substantially in value.

In view of the foregoing facts and circumstances, concerning which the trial court was entitled to take judicial notice, we cannot say the trial court abused the exercise of its power of discretion by excluding from evidence the purchase price paid by the landowners for the tracts in question almost two and one-half years prior to the date of the taking.

The collateral issue which gave the trial court some concern— that admitting the purchase price changes the issue from one of just compensation to how much profit the landowner should receive— received recognition in *Department of Pub. Wks. & Bldgs. v. Gieseking* 108 Ill. App. 2d 105, 246 N. E. 2d 707.

Even assuming the purchase price paid by the Lees was admissible in evidence, an additional fact discloses the appellant herein was not prejudiced by the exclusion of the purchase price paid for the tracts in question. The purchase price of a 12-acre tract purchased by Vincent Lundin in March, 1966, for $3,600 an acre was the same price that the landowners paid the Howenstines in January, 1966, and was placed in evidence by the landowners. The 12-acre Lundin tract was immediately adjacent to and on the south of the west tract herein and in all other respects concerning terrain, location and condition of the property similar to the tracts here in question. The jury had an opportunity to consider a good comparison and determine whether the price of real estate had increased in value from $3,600 an acre over the intervening period of two years and three months.

Did the trial court err in admitting evidence of value on tracts of land, which had not officially been subdivided, on a lot basis as well as on an acreage basis?

The statement of the foregoing question by the parties is at best confusing. Fundamentally, it pertains to the use of the income approach, also known as the development approach, used by the expert real estate witnesses to arrive at their opinion concerning the value of a tract of land.

On this point the trial court by instruction No. 10 instructed the jury as follows:

"Some questions were asked of witnesses relative to sales and purchases of

property, including prices paid therefor. Prices paid or the consideration for the sale or transfer of the same or similar and comparable property or interest in property reasonably near in time to the date of taking on the open market are evidence of fair market value. Market values are not, however, determined by exceptional sales or noncomparable sales.

"In this case the landowner owns 26.90 acres and at the time of the taking it was not platted and developed into lots. The State Highway Commission condemned 8.99 acres of this unit, leaving a remainder of 17.91 acres. Evidence of lot sales was permitted in this case for the limited purpose only of assisting you in determining what the fair and reasonable market value of the landowner's unit was before the taking and the value of the remainder after the taking, and such potential development of this acreage into lots may be considered by you in determining the amount of your award."

While the appellant makes no objection to instruction No. 10, it contends the instruction did not go far enough. As a result it submitted a requested instruction which reads:

"Certain testimony has been given in this case relative to the average price at which platted lots have been selling in different subdivisions in Manhattan. Lot sales may not be considered as comparable sales in the determination of market value of unplatted acreage but may be considered only as evidence of the expected income from sales of lots."

The trial court denied the requested instruction, and in our opinion the appellant was not prejudiced by such ruling in view of the evidence developed at the trial and the instructions given.

The income, or development, approach used by the expert real estate witnesses in the trial of this case was the subject of two extended pretrial conferences. The trial court in stating the permissible approach to counsel for the respective parties recognized the development approach used by real estate appraisers to determine real estate values on developmental property such as the two tracts in question. In this connection the trial court indicated it would permit testimony of comparable lot sales. At the second pretrial conference the following colloquy between court and counsel occurred:

"THE COURT: . . . now if he wants to test the knowledge of the appraiser and ask him about any specific, I think you can do that, not going into detail, I don't think you need to go into more than several specifics, but I think the idea is to see that he has examined the lot sales and in this particular subdivision and ascertain knowledge as to what the general average price of the lots are and show that this subdivision is somewhere in the proximity and comparable to this acreage which has been purchased and to be subdivided. So that would be my ruling as to the manner in which it's presented. We'll have to wait until it's actually presented in court to make any specific rulings, but I think we have a general understanding as to how it should be presented do we not?

"MR. GREEN: Yes, sir.

"MR. DODDERIDGE: *Yes Your Honor and I think our appraiser does go primarily to the point* whereas often seems to happen in these cases where an appraiser wants to take what one lot will sell for and multiply by the total number of lots that you could develop a tract into and say well that's the market value and if presented in that manner we would object.

"THE COURT: If he gave an opinion like that, if that was all that was asked of him and he was going to give an opinion, I imagine the court could consider an objection. As I say *he's got in addition to examination of sale prices, I think an appraiser would have some detailed knowledge of development costs to be properly qualified."* (Emphasis added.)

The supplemental pretrial order entered by the trial court made the reporter's notes of the proceedings in the pretrial conference and a transcript thereof a part of its supplemental pretrial order.

On instructions counsel for the appellant at the pretrial conference said:

". . . we would request that the jury be instructed that the lot sales can only be considered for the purpose of showing what lots would sell for in this area and not as evidence of market value of raw acreage. In other words we think the lot sales go to show the gross income that could be obtained from the sales of these lots, this would have to be discounted."

Therefore, as we view the pretrial order counsel for the respective parties agreed that it was proper to submit the case to the jury and examine their expert witnesses on the income or development approach.

All three of the landowners' expert real estate witnesses were examined and used the development approach to justify their opinions concerning the valuation of the tracts condemned, and the appellant's counsel cross-examined them on such theory.

Two of the expert real estate witnesses called by the appellant were first examined on the market data approach in arriving at their valuation tetstimony. They were then examined *on direct examination by their own counsel on the development approach* to show the similarity of the results obtained by using the two methods of valuation.

The concern expressed by counsel for the appellant at the pretrial conference was that an expert real estate appraiser, after ascertaining the average selling price of the lots in a comparable tract of land, would multiply the total number of lots by such average price per lot and submit the result as the market value of the tract.

An objection made by counsel for the appellant at the trial to the testimony of H. Alan Lee, one of the landowners, was in the form of

a motion to strike his testimony. The challenge was based upon the ground that the witness had taken the objectionable approach, basing his valuation strictly on the average of lot sales and multiplying this figure by the number of lots taken.

The trial court sustained the motion but thereafter permitted counsel for the appellees to rehabilitate the witness and changed its ruling.

On direct examination Mr. Lee testified as to his experience and went into the expenses in developing other subdivisions in the Howenstine Additions. He specifically covered the costs of engineering, recording, the time delay, and immediate cash outlay of bringing utilities and water and sewer lines to the site. He then gave his opinion as to value as of the date of the taking. On the east tract the value before the taking was given at $87,000 and the value after the taking at $20,000; and on the west tract the value before was given at $165,000 and the value after at $114,500. The total difference was $117,500. He summarized his costs at approximately $100 per lot to develop the acreage into lots, including survey and abstract costs. He used a value figure of $3,000 per lot on the east tract and deducted $100 per lot costs, leaving a balance of $2,900 per lot for a total of 30 lots before the taking.

Through this witness exhibits of the tracts platted were introduced into evidence, showing the original number of lots in the tracts and the number lost by the taking.

He valued the lots on the west tract at $3,500 and multiplied that figure by the number of lots lost to arrive at the approximate damages he experienced.

On cross-examination he testified:

"Q. Talking about the east tract, now, the land on the east side here, first of all I will ask you this, upon arriving at your before and after figures in this particular matter did you arrive at these figures by determining the—by considering what this land would sell for in acreage form, raw acreage?

"A. Absolutely not. I had no idea, when I purchased it of ever selling it for acreage, for development as acreage. Whenever you develop, it develops out into lots.

"Q. *And you based your testimony* strictly on lot sales?

"A. I certainly did, it's an orderly procession of our development." (Emphasis added.)

At this point counsel for the appellant moved to strike the testimony of Mr. Lee as to the values and the trial court sustained the motion on the ground that counsel failed to develop the valuation

in the way that it should have been developed. The trial court, after giving counsel for the appellees an opportunity to rehabilitate the witness, heard considerable argument out of the presence of the jury and ultimately stated:

". . . In other words, we don't want to try it on a lot basis, it's on the unit. You can rehabilitate your witness if you want to, if he testifies in establishing the value on a unit he takes into consideration how many lots it would have developed into, and establishing the value of the remainder he takes into consideration how many lots he could develop on the remainder that would be all right."

After further argument the court ultimately stated:

". . . To tell you the truth, it's simply a matter of semantics but there's been an objection here and I think we have to proceed in establishing the value that one of the factors to be considered in setting the value on the unit is how many lots can be developed and how many left in the remainder."

In concluding the court stated:

"I believe he would have to testify as to the fair and reasonable market value of what the land would be worth not to him, but between a willing buyer and willing seller. I think you ought to recall your witness and rehabilitate him in the lines the court suggested."

On further examination Mr. Lee then stated he understood that on the date of the taking it was simply raw acreage and unplatted land the State Highway Commission was taking, and in arriving at his damages he took into consideration the figures he had testified to.

Further *cross-examination* of Mr. Lee by counsel for the appellees went into the *costs* that would be encountered in the development of these tracts into lots.

It has been held that a landowner is a competent witness to testify as to the value of his property. (*Urban Renewal Agency v. Tate,* 196 Kan. 654, 414 P. 2d 28.) The experience of H. Alan Lee, one of the landowners herein, as a real estate developer in the city of Manhattan was sufficient to qualify him as an expert in the valuation of developmental city real estate. Carl V. Lundin was qualified as an expert valuation witness in the trial of this case on the same basis, as a developer of real estate in the city of Manhattan, Kansas. (See *Eisenring v. Kansas Turnpike Authority,* 183 Kan. 774, 332 P. 2d 539.)

Recently this court has held in *City of Bonner Springs v. Coleman,* 206 Kan. 689, 481 P. 2d 950, that once a witness has qualified as an expert, a court cannot regulate the factors he uses or the mental

process by which he arrives at his conclusion. These matters can only be challenged by cross-examination testing the witness' credibility. This rule was reasserted and affirmed in *Morgan v. City of Overland Park*, 207 Kan. 188, 483 P. 2d 1079, with the qualification that:

"The responsibility of defining the extent of compensable rights is in the courts and if it is established that value testimony was based on noncompensable items or the credibility of the testimony is otherwise destroyed the testimony should be stricken in response to a proper motion." (Syl. ¶ 3.)

In view of the foregoing authorities and evidence submitted by the expert witnesses of the appellant, which we shall presently disclose, we cannot say the trial court erred in permitting the testimony of Mr. Lee to stand. Taking Mr. Lee's testimony as a whole, it follows the income approach in valuing the tracts in question.

The appellant subtly attempts to shift its position on appeal by attacking the income approach in the valuation of the landowners' property—a position inconsistent with the theory upon which the case was tried. Here the appellant is bound by the theory upon which the case was submitted to the trial court with its acquiescence. (See *Oliver v. Nugen*, 180 Kan. 823, 308 P. 2d 132, and authorities cited therein.)

The appellant argues on the date of the taking the tracts of land in question consisted of idle acreage awaiting future development. The substance of the appellant's attack upon the income approach in valuing the property is based on speculation. In many of the cases cited by the appellant development of the land was not imminent, and the use of the development approach in valuing the property was denied as speculative because development of the condemned land was uncertain. *K. C. & T. Rly. Co., v. Splitlog*, 45 Kan. 68, 25 Pac. 202, falls in this category and involves other factors which make it distinguishable.

The appellant also relies on cases from other jurisdictions holding that the expert real estate appraisal witness may not testify as to speculative value of the land based upon the aggregate value of all possible lots into which it can be subdivided less costs of development, since the expenses connected therewith make it too uncertain and conjectural. (*Northern Ind. Pub. Serv. Co. v. McCoy et ux.*, 239 Ind. 301, 157 N. E. 2d 181; and *Barnes v. Highway Commission*, 250 N. C. 378, 109 S. E. 2d 219.) Cases cited by the appellant which seem to completely reject the income approach in

appraising real estate taken on condemnation where the property is suitable for development are: *Board of County Com'rs v. Vail Associates, Ltd.,* __ Colo. __, 468 P. 2d 842; and *State Highway Commission v. Reeves,* 8 N. C. App. 47, 173 S. E. 2d 494.

It must be conceded if it is established from all the facts and circumstances in a given case that future development of the condemned tract is speculative, valuation of such tract based upon the development approach may be erroneous. If develoment, however, is not speculative but imminent, as here, then the development approach for valuing the property is a fair and reasonable approach.

The importance of our decision herein lies in the application of the income approach used in the valuation of condemned property which is imminently ready for development.

The expert real estate appraisal witnesses who testified in this case, and particularly those called by the appellant, recognized the three generally accepted approaches used by appraisers in valuing real property: (1) The market data approach which is based upon what comparable properties had sold for; (2) the depreciated replacement cost or cost approach which is based upon what it would cost to acquire the land and to build equivalent improvements less depreciation; and (3) the income approach or capitalization of income which is based upon what the property is producing or is capable of producing in income.

The cost approach was said to be inapplicable on the facts in the present case because there were no improvements on the tracts of land taken in the condemnation proceeding.

The income approach was recognized by this court more than a decade ago in *Eisenring v. Kansas Turnpike Authority,* supra, and has subsequently been followed. The special circumstances under which *Eisenring* was applicable were recognized to exist by some of the expert witnesses in this case—that the income approach is the best method of determining value when it is a known factor and there are no other comparable real estate sales available. On the facts in this case the most recent sales of developmental tracts of real property on an acreage basis similarly situated to the land here condemned occurred more than two years prior to the taking herein. These properties consisted of the Lundin tract which sold for $3,600 per acre in March, 1966, and the Viking Investment Company sale a couple of years earlier for $4,000 per acre. Under the facts and circumstances heretofore discussed, these sales were rather remote in time and of questionable probative value.

Here the expert real estate witnesses for the landowners and the condemner were in general agreement that 20 potential lots were taken from the tract on the west side of the highway and 15 were taken from the tract on the east side. Further, there was no dispute but what the land being acquired was located in the most valuable developing area in the Manhattan community. It was agreed by all the experts that the land being taken was as valuable or more valuable than any other in the area for subdivision purposes. Two of the expert witnesses for the condemner indicated that the value of the lots in the tracts here in controversy would be between $2,750 to $3,500 per lot. They further agreed that approximately three lots could be secured from each acre after due consideration was given to the fact that part of the land would have to be adapted for streets, alleys and other such uses. Generally the expert appraisal witnesses agreed that lot values were in the neighborhood of $3,000 per lot. They further agreed that utilities were available to the site and in applying the development approach, no cost need be considered for extension of utilities to the site. They were in agreement that there was a substantial demand for residential lots in the Manhattan area, and the demand was increasing due to the expansion of Kansas State University, and because of other commercial and industrial activity in the community.

While the appellant strenuously objects to the use of the development approach, the appellant produced two witnesses who readily acknowledged the existence of the development approach and demonstrated graphically how it applied to the circumstances of this case. The record clearly establishes that expert land appraisers acknowledge the existence of, and employ, the development approach in valuing subdivision land. It is a well established approach employed by appraisers.

The appellees had been financing internal improvements such as streets, sanitary sewers and water lines by the use of special benefit districts. This is a technique commonly employed by subdivision developers. K. S. A. 12-6a01, *et seq.*, provides statutory authority for the formation of these special benefit districts. This permits the assessment of the costs of these internal improvements against the lot holders. It was agreed by all expert appraisal witnesses that the appellees, and other developers in the area, have been using this technique. There was no expense to be considered in the develop-

ment approach for either off-site improvements or internal improvements.

A graphic demonstration of the development approach by Richard Kessler, *one of the appellant's expert land valuation witnesses,* is as follows:

"DEVELOPMENT APPROACH 'BEFORE'

| | | |
|---|---|---|
| 80 lots at $2,900.00 each | | $232,000.00 |

DEVELOPMENT COSTS

| | | |
|---|---|---|
| Brokers & selling fee 10% | $23,200.00 | |
| Engineering & Abstract fee $100/lot | 8,000.00 | |
| Clearing & surplus hauling $85/lot | 6,800.00 | |
| Taxes for 80 lots at $90 ea. | 7,200.00 | |
| Interest on investment in land at 6% | 5,649.00 | |
| Profit 15% | 34,800.00 | |
| Total expenses | | −85,650.00 |
| Adjusted gross from sale of lots | | $146,350.00 |

PROCESSING OF GROSS INCOME

Development period 7 yrs. (approx. 12 per year)
Interest rate 8%
Discount factor 5.206
$\frac{1}{7}$th of income per year is $20,907.00
Present value = $20,907.00 × 5.206 = ................ $108,840.00

DEVELOPMENT APPROACH 'AFTER'

The same method used to obtain the 'before' value was also used to obtain the 'after' value pursuant to the new values shown below which reflect the reduced size of the property in the after condition and the shortening of the development period.

Approx. 40 lots left after taking
30 lots at $2,900.00 each
10 lots at $2,500.00 each

Development period 4 years (approx. 11 per year) resulting in changed discount factor.

Present value ........................................ $57,330.00

SUMMARY: (Development approach)        (Market data approach)
Indicated 'Before' value  ...... $108,840.00    'Before'.... $106,760.00
Indicated 'After' value  ........   57,330.00    'After'  ....   55,165.00

                        $51,510.00              $51,595.00"

Kessler used the market data approach and the income approach. The cost approach was said not to be applicable because there were no improvements on the property. In applying the market data

approach Kessler considered the Lundin property and the Viking Investment Company sale. Using this approach he arrived at a difference of $51,595 for the total loss in market value for the taking of the two tracts in question.

*On direct examination by the appellant* Kessler then testified concerning the development approach, the starting point of which he said was *the selling price of lots.* He referred to the development approach as the income approach and testified that the purpose of using it was:

"Well, it has a two-fold purpose, particularly where you have a lack of a good market approach and it should be the approach, I would say, that a developer should use before he buys the property, because the end result of this indicates what he could afford to pay for—what he could afford to pay for a piece of ground in order to develop it in its raw state and by backing into it through a development approach, it's the only way you can determine what you can afford to pay for the property. Now, in any case you can have an inflated market and cost and value are not the same thing and consequently the two should be used in conjunction with one another, and you would only place reliance on the development approach if you didn't have a good market approach."

He based his development approach on 80 lots or approximately 3 lots per acre in the "before" valuation. He used 40 lots in the "after" valuation. His reason for using 40 lots for the "after" value was given as follows:

"Because of the shape and nature of the taking on both sides it would create—first we have a loss in acreage and we have created more of an irregular shape than what we had in the original piece of property. As you reduce the size of the tract, your ability to create entrances where you want them, the ability to lay the lots out in an efficient manner become less and in each case I felt like we lost from eight to ten lots over here because of the narrow strip on the north and irregular shape, we narrowed it down at the bottom and we have something similar to this on the other side where we created more corners than they had before and they created some difficulty and we lost several lots in there that we probably wouldn't have if the lot had been left in a larger size or rectangular shape."

He explained how he valued the entire acreage before the taking by the following answer:

"Well, I used basically three lots per acre on the total acreage. We would have a total of eighty lots. Now this could be at the discretion of the engineer that lays the thing out or the developer. He has some control over this, he could have a few more than eighty lots, he could have a few less lots, depending on the type of market that he was selling to and the type of houses that he was building and I used two thousand nine hundred dollars a lot. Now we have in addition to the south we have quite a few lots that were sold to builders

and individuals at two thousand seven hundred fifty dollars per lot and Mr. Lee is selling lots in the neighborhood of three thousand dollars to people who he is building homes for, and without question, I think, considering the value of the homes, which will run any place from twenty-five, twenty-six thousand and with maybe some in the neighborhood of close to forty thousand in that area, the majority of them will run in the neighborhood of around thirty thousand, and a ten percent land to building ratio would be considered a reasonable balance, *so I think there's no argument with the value in the range of three thousand dollars.* Now, we are moving across from an area developed into a bare land area and I think in my case I downgraded these one hundred dollars per lot for no other purpose than the location is not as good and you don't have the intimacy that you gain by having other houses around you. The other lots over in the Howenstine One through Eight would be a little more desirable than coming across the property line into this area, so I downgraded this one hundred dollars an acre and used two thousand, nine hundred dollars in the estimate value of lots. If you take that times two thousand, nine hundred dollars per lot, if you sold all of the lots, you would have two hundred thirty-two thousand dollars, that would be our expected income off the entire sale of the entire property." (Emphasis added.)

He then explained the development costs that must be deducted, which were heretofore illustrated. He went through his computation step by step and explained the discount figure in his computation by testifying:

". . . Now, we have the problem of what we call processing the income from this and this is done by using a discount rate or establishing the development period and applying a discount rate from standard tables that bankers have. . . ."

Another expert witness on land valuation testifying *for the appellant* was David W. Craig. He testified the best method for appraising vacant land was the market data approach *if you can find sales of similar properties.* He used the market data approach and checked it with a development approach. In this connection he testified:

"Well, I think the price that you can get for lots, if discounted, is going to indicate the maximum that you can pay for raw acreage to use for single family purposes. I think it is one of the approaches to the valuing a vacant tract, the development approach, and to do that you have got to estimate what lots would sell for."

He was asked on direct examination whether in appraising raw land it was an accepted appraisal practice to multiply the number of lots by the dollars per lot. He gave a negative answer and explained it by stating:

"Well, the only way that that would be a true indication of value would be to assume that you could sell however many lots that you had at a price on

that day with no expenses. I mean if that were true, why then it would be an accepted method."

He then testified concerning the expenses that were encountered including expense connected with selling lots, engineering, abstracting and taxes, and he said:

". . . in a true subdivision you have got a profit for the developer or subdivider to take into consideration.

"Q. And in addition to that would you have to apply—in addition to deducting these expenses, would you have to apply some sort of a discount factor to reflect the fact that your money or capital is tied up in this property?

"A. Yes, you will have to discount the money you are going to receive, different times, year by year, to present value because you are valuing the land today."

On cross-examination he testified:

"I think $2,500 to $3,000 is the range of lot prices in Manhattan. The east and west tract together should be able to produce very close to 79 lots. My investigation revealed that utilities would be available up to the two tracts at no cost to the developer. In my opinion you must consider a 10% real estate commission whether Mr. Lee sells the lots himself or not. It will take about six years to complete the Lee Development area consisting of seventy-nine lots. My development computations would take a different color if the six years is not correct.

"*In my opinion it would be no problem to plat the land. The fact the land is unplatted really isn't a factor in my evaluation of it.* Supposing that the land were subdivided, the utilities were laid up, lots were selling from $2,750 to $3,500, and considering all activities in the Northwest part of town, I think it is unrealistic to assume that someone might offer to buy all of the lots today and pay full price for them without any discount." (Emphasis added.)

The landowners' evidence disclosed that the Lee brothers have been building and selling houses without benefit of realtors, and that there would be no occasion for them to pay any real estate commissions. Costs of procuring an abstract, surveying costs and the costs of preparing a plat were said to be minimal. Processing a plat before the appropriate regulatory bodies was revealed to be a simple and uncomplicated procedure, and the filing of a plat required no particular skill or experience. In the development of the Howenstine Additions Nos. 1 through 8, the Lees constructed from 130 to 140 houses in these eight subdivisions.

Carl V. Lundin, an expert witness for the landowners, who owned the Lundin property to the south of the west tract here in question, was engaged in the home building business with his brother for the past twenty-four years. In establishing the fair market value he viewed the tract as a whole area, but he said in

buying any land the first thing you think about is the number of lots you can get out of it. In his opinion the tracts in question as of the date of taking could have been developed within four or five months. This would be the time it would take to get the streets, sewers, etc., in that were needed. His estimation of the approximate cost to the developer of getting a plat from a tract of ground to a subdivided plat per lot would not be over $100 per lot. In his opinion the tracts in question were not worth any less because they had not been platted than if they had been platted as of June 20, 1968, the date of the taking. The reason he assigned for this was:

"Well because it's just one of the best areas up there and it's—you can't buy better lots anywhere in any direction of Manhattan with less expenses to develop it. All building is going that way and well that's—I don't know if that's answered the question."

Mr. Lundin testified he paid $3,600 per acre for his tract approximately two years and three months prior to June 20, 1968. He said the lots on his land were worth $3,000 at the time of the taking. He said his land had increased that much in value in just two and one-half years because there was no more land for sale in that area, a factor which he described as having a significant impact on the value of the land. In the opinion of Mr. Lundin the value of the Lees' east tract before the taking was $90,000 and after the taking $25,000, leaving a difference of $65,000. The value of the west tract before the taking was $147,000 and after the taking $105,000, leaving a difference of $42,000, for a total of $107,000 damages.

Basically, the difference in value arrived at by the expert real estate witnesses who testified for both the landowners and the condemner using the development approach, was in the expense factors to be deducted in the development and sale of the property. While the appellant's witnesses contended it would take six to seven years to develop these tracts and complete the sale of the lots, it was the opinion of the expert witnesses testifying for the landowners that the time element in disposing of all the lots would be relatively short if the lots were placed on the open market.

In the opinion of the landowners' expert witnesses development of the tracts in question was imminent and costs to the landowners in development of the tracts would not be more than $100 per lot.

This court in *City of Wichita v. Jennings,* 199 Kan. 621, 433 P. 2d 351, has recently held that photographs and drawings are admissible

in a condemnation action to show a possible scheme of development of land for its best and most profitable use, quoting 5 Nichols on Eminent Domain (3rd Ed.), § 18.11 [2], at p. 157, as follows:

" '. . . Thus, evidence of the market value of the property for the best and most profitable use to which it may be devoted in the reasonably near future is admissible.

" 'As bearing upon these issues the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, provided it appears that the likelihood of demand for the property for that purpose is such as to affect market value. . . .' " (p. 626.)

On facts similar to those here presented several cases support use of the development theory. In *Commonwealth v. McCready* (Ky. 1963) 371 S. W. 2d 485, the court said:

"Appellant's second contention that appellees' witnesses were allowed to put a developed subdivision lot value on an undeveloped tract is equally without merit. This concerns the 11.4 acres. The witnesses testified to the value of the land for subdivision purposes and then made appropriate allowances for developing it. One witness, in describing how he arrived at a value, said that he took into account the number of lots that could be produced, comparable sales in similar subdivisions, allowance of a reasonable time in which to sell the lots, and cost of development of the subdivision, including installation of utilities and paved streets. The procedure used by appellees' witnesses was similar to the procedure used by appellant's witnesses, who treated the land as subdivision lots instead of as farm land. The witnesses testified to varying values. The jury was thus left to fix a value based on the testimony heard. There being no showing of bias or prejudice, the verdict should stand. . . ." (p. 487.)

The Court of Appeals of Maryland in *State Roads Comm. v. Halle*, 228 Md. 24, 178 A. 2d 319, indicated it was appropriate to employ the development approach, saying:

"We are unable to agree. We have seen above, from appellant's witnesses as well as those of the appellees, that development costs can be estimated with considerable accuracy, and they are an important, if indeed not a vital, factor in determining the price that a prospective purchaser will pay for an undeveloped property. Evidence of comparable sales in eminent domain proceedings is admissible either as primary evidence bearing upon the market value of the subject property, or to support and bolster the opinion of an expert upon such market value, or both. . . ." (p. 32.)

On the facts in *State v. Barrilleaux* (La. 1962) 139 So. 2d 242, the development approach was held proper in a case where previously subdivided lots were taken. Other cases recognizing the development theory are *State, Department of Highways v. Cobb* (La. 1964) 169 So. 2d 419; *Cuomo v. State of New York*, 21 A. D. 2d 724, 250 N. Y. S. 2d 149; and *Buena Park School Dist. v. Metrim Corp.*, 176 C. A. 2d 255, 1 Cal. Rptr. 250.

The appellant's argument that the appellees in the trial of this case disregarded tract sales and merely aggregated the estimated values of fully subdivided lots which might be obtained, and passed this off to the jury as being equivalent to market value of the tracts, is not supported by the record. Both at the pretrial conference and at the trial the appellant acquiesced in the appellees' method of valuation. Under the circumstances, it was the appellant's obligation on cross-examination of the appellees' expert witnesses to test the knowledge and competency of such witnesses to value the property by the development approach. (*Morgan v. City of Overland Park*, 207 Kan. 188, 483 P. 2d 1079.)

From all the evidence presented by the record it was abundantly apparent to the jury that development of the land taken by condemnation into homesites was imminent. Evidence on valuation of the land by the income approach was of sufficient certainty to permit the jury to ascertain the damages sustained by the landowners. On the facts in this case resort to the market data approach in valuing the property would have been more speculative and conjectural.

Here a developer contemplating purchase of the tracts in question would have used the development approach. Under these circumstances, where market data on recent sales of comparable property was not available, a potential purchaser would have applied the development approach in endeavoring to determine the fair market value of the land taken, and the law must recognize that fact.

It is apparent the jury awarded compensation substantially below the valuation testimony of the landowners' witnesses but well within the range of the evidence. (*Kansas State Highway Commission v. Roepke*, 200 Kan. 660, 438 P. 2d 122.) The verdict reflects the jury gave due consideration to the cost and discount factors involved in the development approach pursuant to which the case was tried and the jury instructed.

The judgment of the lower court is affirmed.

FONTRON, J., dissenting: It is no easy task to dissent from one of Justice Schroeder's massive, comprehensive and persuasive opinions. Nonetheless I feel compelled to make the effort because of the error which I believe inhered in the trial proceedings and resulted in a trial less than fair to the state.

It is obvious from an examination of the record that the land-

owners, from the time of pretrial conference through final argument, proposed to establish the market value of the condemned land on the basis of a loss to them of some thirty-five prospective lots, twenty of which they valued at $2900 each and the remaining fifteen, at about $3500 per lot. It is likewise apparent that the condemnees, the Lees, sought to prove the prospective lot values by showing what lots sold for in firmly established subdivisions scattered throughout the city of Manhattan.

This method of procedure is clearly indicated by extensive colloquies between court and counsel prior to trial resulting in a ruling set forth in a pretrial order filed March 10, 1969, that "lot sales of platted land would be allowed to be admitted into evidence to establish market value of unplatted lots." This ruling was reiterated in a supplemental pretrial order that "lot sales should be admitted." This persistent ruling was made over strenuous objection by the state, whose opposition thereto never abated. Any inference which might be gained from reading the court's opinion, that the state had acquiesced in this method of establishing the value of unimproved land, would be wholly unjustified.

The general rule, upheld in an overwhelming number of jurisdictions, is set forth in 4 Nichols on Eminent Domain, 3d Ed., § 12.3142 [1]:

". . . It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used as a farm or is covered with brush and boulders. The measure of compensation is not, however, the aggregate of the prices of the lots into which the tract could be best divided, since the expense of cleaning off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, and holding it and paying taxes and interest until all the lots are disposed of cannot be ignored and is too uncertain and conjectural to be computed. In any event, if evidence is offered as to developed value consideration must be given to the cost of developing that value. . . ."

This general principle is similarly stated in 26 A. L. R. 3d, Condemnation—Possible Subdivisions, § 4, pp. 794-796.

In Kansas such has been the rule from an early date. (*K. C. & T. Rly. Co. v. Splitlog,* 45 Kan. 68, 25 Pac. 202; *K. C. & T. Rly. Co. v. Vickroy,* 46 Kan. 248, 26 Pac. 698.) In both of these cases the condemned land was unimproved and the trial court admitted evidence of the value of nearby lots, some of which, in the *Vickroy* case, even adjoined the tract taken. The essence of the decision in *Splitlog,* which was quoted with approval in *Vickroy,* was phrased in the following words:

"In cases like this, where damages are limited to the value of the land appropriated, the proper inquiry is, What was the market value of such land, for any present use, in the condition in which it was immediately prior to its condemnation by the company? Witnesses testifying as to the value of such land may consider any use to which the ground may be presently put, in forming their opinions as to its value; and its surroundings may be shown to the jury—its nearness to, or distance from, a town, village, or city, or other improvements that tend to affect its value; but the jury are to value the land as a whole, in the condition in which it was when taken. They have nothing to do with its subdivision into lots or blocks. They may consider its location, and the effect its location has upon its value as a whole; but the evidence as to how many lots it would make, and what they would sell for after the sub-division, is wholly improper. . . ." (pp. 72, 73.)

The impact of the *Splitlog* decision on the law of eminent domain in this state cannot easily be shrugged aside with the comment that the case contains features which are distinguishable from those here.

Time will not permit extended discussion of the many authorities supporting the rule heretofore quoted from Nichols on Eminent Domain, supra. A couple of recent examples will have to suffice.

The facts before the Supreme Court of Colorado in *Dept. of Highways v. Schulhoff*, 167 Colo. 72, 445 P. 2d 402, were strikingly similar to those in the present action. The land taken for highway purposes in the Colorado case consisted of a strip of slightly more than three-fourths of an acre lying along the highway. Admittedly, the highest and best use of the tract was for subdivision into residential building sites. At the trial, the landowners' appraisers were permitted to arrive at their opinion of the fair market value of the undivided tract by hypothetically carving it up into residential building sites, estimating the value of each site, and then adding the estimated values together.

This method of computing value was held to be erroneous, and in reversing the case, the court had this to say:

"It is proper to show that a particular tract of land is suitable and available for subdivision into lots and is valuable for that purpose. It is not proper, however, to show the number and value of lots as separated parcels in an imaginary subdivision thereof. Stated differently, it is improper for the jury to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact. Such undeveloped property may not be valued on a per lot basis, the cost factor clearly being too speculative.

. . . . . . . . . .

". . . Valuation must be based on what a willing purchaser will pay for the whole at the time of the taking and not what a number of purchasers

might be induced to pay in the future for the land in smaller parcels. (Citing cases.)" (pp. 77, 79.)

At a later stage of its opinion the Colorado court, in discussing the admissibility of testimony concerning prices paid for similar building sites, quoted with approval the following language found in *State Roads Commission v. Wood*, 207 Md. 369, 114 A. 2d 636:

". . . The vice in comparing subdivided land and unsubdivided land lies in the fact that the comparison is between a wholesale and a retail price for the price of the platted lots includes the expense of subdividing and the promotional and sales costs of moving the individual lots. . . ." (p. 81.)

The *Schulhoff* case was followed in *Board of County Com'rs v. Vail Associates, Ltd.*, __ Colo. __, 468 P. 2d 842.

In *Highway Commission v. Conrad*, 263 N. C. 394, 139 S. E. 2d 553, 12 A. L. R. 3d 1055, the North Carolina Supreme Court sustained a ruling entered by the trial court that a designated number of lots multiplied by a price per lot was not the proper basis for determining the value of undeveloped land suitable for subdividing. In the course of its opinion the court stated:

". . . The fair market value of undeveloped land immediately before condemnation is not a speculative value based on an imaginary subdivision and sales in lots to many purchasers. It is the fair market value of the land as a whole in its then state according to the purpose or purposes to which it is best adapted and in accordance to its best and highest capabilities. It is not proper for a jury to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact. Such undeveloped property may not be valued on a per lot basis. (Citing cases.)" (p. 397.)

The rule laid down in this case was later given approval in *State Highway Commission v. Reeves*, 8 N. C. App. 47, 173 S. E. 2d 494.

An objective perusal of the present record will disclose that the landowners' witnesses, in placing a value on the tracts taken, violated the rule just discussed. One of the owners, H. Alan Lee, who appeared as his own first witness, stated on cross examination that he based his testimony strictly on lot sales.

Other witnesses testifying for the Lees took the same approach. Mr. Lashbrook, head of the Kansas State University department of journalism, and with appraisal experience, testified he arrived at his figure of compensable damage by determining the sale prices of lots in other subdivisions, some of the lots having been sold over a period of three or four years. Mr. Lundin, who owned an undeveloped tract adjoining the Lee property, stated he examined lot sales in other subdivisions and applied the value of those lots to

the tracts taken. The Lees' last witness, Mr. Haley, a Lawrence real estate broker dealing principally in commercial and high-rise apartment properties, likewise examined lot sales and applied lot prices to the tracts.

I am frank to acknowledge that the modern tendency in jurisdictions which, like Kansas, have approved the development approach as an acceptable basis for determining market value, is to admit evidence of the developed value of a tract which was condemned as raw land. The existence of this trend is tacitly recognized in the final sentence of the rule heretofore quoted from 4 Nichols on Eminent Domain, 3d Ed., supra. That sentence, which begins on page 177, will bear repeating:

". . . In any event, if evidence is offered as to developed value *consideration must be given to the cost of developing that value. . . .*" (Emphasis supplied.)

Cases which give voice to the modern drift are collated in the 1970 Supplement to Volume 4 of Nichols on Eminent Domain, 3d Ed., pp. 80-84.

It is precisely in this area of development costs that the greatest prejudice has occurred. As I read the testimony of landowners' witnesses they have ignored certain basic costs inhering in the development and sale of subdivision lots. For example, H. Alan Lee, after first stating that he based his testimony *strictly on lot sales,* was permitted by the court to rehabilitate himself as a witness. He thereafter testified that in addition to his land cost all that he would have involved in the sale of each lot would be engineering and abstracting fees of $100. This is hardly rehabilitation! Lee entirely omitted from his computation of costs major factors necessarily involved in the development and sale of subdivision properties. Among the costs of development which any prudent investor would take into account, and which I would have assumed every qualified appraiser would concede to be valid, are the time lag involved, interest on investment, sales expense, taxes, and similar discount factors. (See *State v. Tedesco,* 4 Utah 2d 248, 291 P. 2d 1028.)

Testimony of the other witnesses who appeared on behalf of the Lees was infected with the same fatal infirmity. The only item of possible cost mentioned by Lundin, over and above the $100 per lot figure to which Mr. Lee referred, was a $1000 per lot expense of putting in streets. Haley would infer development costs of only

$100 per lot, while Lashbrook apparently considered that no development costs were involved.

When the two Lee tracts were condemned they were both raw land. Although preliminary sketches of proposed subdivisions had been drawn some years before, and a proposed plat of the east tract was offered for filing shortly before the condemnation, basically nothing had been done in the way of subdivision development. The tracts were not in the city limits on the date of taking; the Lundin tract was undeveloped; and another tract nearby, owned by the Lees, was not yet platted. While the potentiality of development was present, the finished product was not imminent. On oral argument we were informed that on the date of trial, more than nine months after the taking, development had not even started.

There is a significant difference between the value of land potentially avaiable for subdivision purposes and the value of that same land after it has been fully developed into lots which are ready to market and are available for present sale. Far less expense is involved in selling forty-five lots in bulk to one ready and willing buyer, than in selling those same lots piecemeal to multiple buyers.

In speaking on this subject, the Ohio court, in *In Re Appropriation*, 15 Ohio App. 2d 131, 239 N. E. 2d 110, had this to say:

". . . Except in the event of a rare and highly promoted auction sale taking place in a single day, a subdivision is ordinarily sold to a multiplicity of buyers over a period of years. This factor of time must be considered, to arrive at the fair market value on the single day of taking." (pp. 135, 136.)

Mr. Lashbrook testified that in one of the additions he used in obtaining lot prices, the lots were sold over a period of three or four years. The value today of an unplatted lot which may not be ready for sale, or for which no market may exist for some years, cannot rationally be equated with yesterday's sale price of the finished product.

The problem is put in clear perspective by the testimony of Richard Kessler and David Craig, both of whom testified for the state. Much of their evidence is detailed in the majority opinion, including a tabulation prepared by Kessler demonstrating the cost factors he considered essential in using the development approach. I need dwell on their testimony no longer than to say that both witnesses emhasized the importance of basic factors which must be taken into account in a fair application of the development approach, and which Lees' witnesses obviously omitted.

The general principle seems well expressed in *State v. Tedesco,* supra;

"A condemnee is not entitled to realize a profit on his property. It must go to the condemnor for its fair market value, as is, irrespective of any claimed value based on an aggregate of values of individual lots in a subdivision which one hopes to sell at a future time to individuals rather than to an individual. The test is not what the lots will bring when and if 62 willing buyers come along, but what the tract, as a unit, and as is, platted or not, and in whatever state of completion, will bring from a willing buyer of the whole tract. . . ." (p. 251.)

As a practical matter, I realize that the development approach in determining market values is a standard method employed by many professional appraisers. This court has acknowledged it as an acceptable tool to use in conducting appraisals. I doubt however, that the legislature in enacting K. S. A. 26-513 (*a*), which relates to just compensation, ever contemplated that the market value of a piece of raw land taken in eminent domain proceedings should be established by (1) dividing it into hypothetical lots, (2) determining the value of each hypothetical lot by securing the sale price of lots in established subdivisions and (3) multiplying the number of hypothetical lots by a lot value so ascertained. There is no Kansas statute of which I am aware either in our Code of Civil Procedure, our Code of Evidence, or our Eminent Domain Act which would countenance that method of computing compensable value.

True, K. S. A. 60-407 provides that all relevant evidence is admissible unless otherwise provided by statute. The key word in this provision is "relevant." This statute does not extend an open invitation to irrelevance. Despite some of the language appearing in *City of Bonner Springs v. Coleman,* 206 Kan. 689, 481 P. 2d 950 and *Morgan v. City of Overland Park,* 207 Kan. 188, 483 P. 2d 1079, trial courts have a duty to limit the admission of evidence to that which is pertinent. This obligation extends, in my judgment, to the testimony of expert witnesses as well as others, and when expert testimony is based on irrelevant factors, or fails to consider relevant factors, the court should exclude it.

The prejudice which I believe resulted from the admission of evidence relating to sales of developed lots was compounded by the rejection of evidence as to the purchase price of the condemned land. The general rule is that evidence of such character is admissible where the sale was made in good faith, was voluntary

and was not too far removed in point of time or place. (5 Nichols on Eminent Domain, 3d Ed., § 21.2) Since this court's opinion was handed down in *City of Wichita v. Jennings,* 199 Kan. 621, 433 P. 2d 351, I am confident the same rule would apply in Kansas. (See, also, *Humphries v. State Highway Commission,* 201 Kan. 544, 442 P. 2d 475.

It is conceded that to be admissible, the purchase price of the property taken must be relevant in point of time and distance, and that its admissibility on the ground of relevancy lies within the sound discretion of the trial court. Under ordinary conditions, I think it could scarcely be said that an abuse of discretion was shown here.

Under the peculiar circumstances of this case, however, where evidence of sales of comparable tracts was slight, and where the trial court permitted evidence to go to the jury of prior sales of lots in established subdivisions, I entertain the belief that the exclusion of the purchase price was most probably prejudicial. The sale of the subject property was not remote in time, the physical condition of the tracts remained unchanged, and while there may have been changes in economic conditions during the intervening two and one-half years, this could well have been shown on cross examination. As this court observed in *City of Wichita v. Jennings,* supra, "most of such factors go more to the weight to be given the testimony than its admissibility." (p. 625.)

For the reasons given, I respectfully dissent.

FATZER and KAUL, JJ., join in the foregoing dissent.