No. 48,832

DELOS ELLIS, *Appellant,* v. CITY OF KANSAS CITY, KANSAS, a Municipal Corporation, *Appellee.*

(589 P.2d 552)

Opinion filed January 20, 1979.

*Blake A. Williamson,* of Williamson, Cubbison, Hardy & Hunter, of Kansas City, argued the cause, and *Warren McCamish,* of the same firm, was with him on the brief for the appellant.

*Reid F. Holbrook,* of Steineger, Holbrook, Parks and Fritz, of Kansas City, argued the cause, and *J. F. Steineger, Jr.,* of the same firm, *John W. Strahan,* of the department of transportation, and *Lawrence Long,* of the right of way department, were with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the landowner, Delos Ellis, from an order entered approving the verdict of a jury and denying the landowner's motion for a new trial in an eminent domain proceeding. Error is claimed in the admission of evidence offered by the condemnor, the city of Kansas City, Kansas.

Ellis was the owner of a 19-sided tract containing about 6 acres of land, lying between the Kansas Turnpike and the Union Pacific railroad property. The tract was bounded by the railroad, Matoon Creek, and Muncie Boulevard, and it was accessible by highway and by means of a railroad spur. There were four modern houses on the property; these were occupied by Ellis and members of his family. In addition to the homes, there were several commercial structures which were utilized by the land-owner in the manufacture of horseradish. One was a 62 foot square concrete factory building in which processing and bot-tling were carried on. That building was equipped with an industrial elevator which descended to the basement cold storage area. A second building was a 28 by 31 foot concrete-floored trimming shed; and a third was a 24 by 34 foot pepper building. All of these residences and commercial structures were supplied with gas, electricity, water, and sewer through lines constructed by the landowner. A gas well, drilled in 1940, had supplied all natural gas needed for heating, cooking and industrial purposes continuously for 33 years. Two state approved water wells pro-vided all water to the premises. The only utility purchased was

electricity, and that had been generated on site by gas-fired generators for many years.

The entire property was taken for the construction of a highway access right-of-way on I-635, the date of taking being September 18, 1973. Court-appointed appraisers fixed the value at $105,000. Ellis appealed. The jury raised the value to $110,000; this appeal followed.

The first claim of error is that the trial court erred in allowing the city's expert witnesses to testify in detail as to valuations placed on separate items rather than requiring the witnesses to testify in terms of a "unit" or overall valuation.

Over objection by the landowner, the city's valuation witnesses were allowed to testify on direct examination their dollar valuation of each structure on the land, each value being based upon estimated replacement cost less depreciation, thus arriving at a total valuation for the buildings. The witnesses then gave an estimate of the separate value of the land. The total of the separate values of the buildings and the land was then given as the witness's valuation of the total taking. While all of the testimony is not set out in the record, the first city valuation witness, Jack Forbes, testified that by using replacement cost less depreciation, he arrived at these values: the houses, $6,650, $4,000 and $4,450 (the value of one is not shown in our record); the pepper shed, $2,450; the trim barn, $500; the factory building, $26,050; the storage barn, no value; total value of the improvements $47,500. By using the market data approach, he arrived at a valuation of $30,150 for the land. The fair market value of the entire property was in Forbes' opinion $77,450.

The other city valuation witness, Swender, stated on direct examination that his appraisal figure was separated into a value for improvements and a value for the land itself. He used the cost less depreciation approach for the improvements, and through this method valued them at $51,400. In valuing the land, he used the market data approach; he valued it at $45,300. His total value of the property as a whole was $96,700.

Appellant contends that this testimony violates our longstanding unit rule, set forth in *Hoy v. Kansas Turnpike Authority*, 184 Kan. 70, 334 P.2d 315 (1959), and subsequently in our Eminent Domain Procedure Act, K.S.A. 26-513, enacted in 1963. In *Hoy*, where a partial taking was involved, we said:

"Improvements, such as here involved, located upon land which is condemned, are not to be valued separately but are a part of the real estate and must be considered in determining the value of the land taken. [Citations omitted.] Where, as here, agricultural land devoted to general farming operations and the raising of livestock is acquired for public use, the value of buildings, other improvements and fixtures on the land taken may be given dual consideration; first, they are a part of the real estate and are required to be valued as a part of the land taken; and second, their taking may also be considered by the jury in determining the damage, if any, to the land remaining which is deprived of their use for the purpose to which the farm as a whole is adapted for its highest and best available use." (p. 74.)

K.S.A. 26-513 provides in applicable part that in a complete taking, the measure of compensation is the value of the property at the time of the taking. The statute also lists some fifteen factors which, if shown to exist, must be given consideration "not . . . as separate items of damages, but . . . only as they affect the total compensation." Buildings are not among the enumerated items; being a part of the real estate, their value would be reflected in the value of the entire property. *Humphries v. State Highway Commission,* 201 Kan. 544, 546, 442 P.2d 475 (1968).

We recently considered the statute in *Rostine v. City of Hutchinson,* 219 Kan. 320, 548 P.2d 756 (1976), where we said:

"To assist the court or jury in ascertaining the amount of damages the legislature has designated fifteen factors to be considered if shown to exist. The statute, however, directs that the factors are not to be considered as separate items of damage, but are only to be considered as they affect the total compensation. (K.S.A. 26-513[*d*].) This latter requirement is a codification of the rule of law of this state which prohibits the use of the 'summation method' of valuation.

"The 'summation method' denotes a process of appraisal whereby each of several items that contribute to the value of real estate are valued separately and the total represents the market value thereof. Use of this method of appraisal has generally been rejected since it fails to relate the separate value of the improvements to the total market value of the property. [Citations omitted.] In contrast, the 'unit rule,' which is the generally accepted method of valuation, denotes a process of appraisal whereby the total value of real estate is first determined without placing a value on each of the separate contributing items. Consideration of the value of buildings and improvements is limited to the extent they enhance the value of the land taken. The same rule applies to machinery or other articles of personal property which have become affixed to the real estate." (p. 323.)

One of the city's valuation witnesses in *Rostine* testified as to the separate value of improvements before testifying as to the value of the entire tract. We found this violative of the rule in *Hoy,* and a use of the forbidden "summation" method. We

disapproved of the testimony, but in view of the peculiar facts of the case we found no prejudicial error.

In *State Highway Commission v. Lee,* 207 Kan. 284, 485 P.2d 310 (1971) we recognized the three generally accepted approaches used by appraisers in valuing real property, which we listed as follows:

"(1) The market data approach which is based upon what comparable properties had sold for; (2) the depreciated replacement cost or cost approach which is based upon what it would cost to acquire the land and to build equivalent improvements less depreciation; and (3) the income approach or capitalization of income which is based upon what the property is producing or is capable of producing in income." (p. 299.)

The first method listed, the market data approach, is by far the most commonly used method of appraisal. It is the method which should be used when there have been sales of comparable properties in the same locale near the time of the taking. The unit rule is applicable whenever the market data approach is employed. When, however, the property is so unique that there is no ascertainable market and there are no sales of reasonably similar or comparable property, the other methods—depreciated replacement cost, or capitalization of income—may be resorted to. These methods of appraisal do not require application of the unit rule. In those rare instances when these alternative methods are used it would be an empty formalism to require the expert witness to state the overall value before testifying as to how the value was determined.

The market data approach was not used by any of the expert witnesses in this case in arriving at their respective values of the entire property for the reason that there were no comparable property sales. Over a year before trial, the trial judge ruled that the nine tracts suggested as comparables by counsel were not in any sense comparable to the Ellis tract; that some of the comparables would require 65 to 70 per cent worth of adjustments, and that such evidence would be unrealistic and not helpful to the court or the jurors in determining value. The judge found that this was indeed a very unique piece of property. He made it clear that the proposed comparables could not be used either as direct evidence or in cross-examination. Counsel did not then and do not now challenge that ruling.

During oral argument before this court, counsel for the land-owner explained that this was the only horseradish plant between

St. Louis and Denver. The factory building was specially constructed for that purpose. The basement was used for cold storage; it had eighteen-inch stone walls, lined with concrete, and insulated with a four-inch layer of cork. The two water wells, the gas well, the extensive system of underground utility lines, the irregular shape, the residences, and the unusual use made it a truly unique property.

The appraisers could not use the usual market data approach for the property as a whole, since there were no comparables. The city's appraisers testified that they used the depreciated replacement cost method. The landowner's appraisers each first gave an opinion as to the value of the entire tract, then broke those figures down into dollar values for the improvements and dollar values for the land. Neither explained his method of valuation, except one said that his value on the land was computed at 72 cents per square foot, the value of the land as an industrial site. The values attributed to the improvements by the four appraisers and by the landowner were fairly consistent, with the landowner's value being the smallest; the great disparity is reflected in the opinions as to the value of the land. All four appraisers agreed that the highest and best use for the land was as an industrial site.

Where there are no sales of comparable properties, the basis of valuation must be something other than market data. In *Eisenring v. Kansas Turnpike Authority,* 183 Kan. 774, 332 P.2d 539 (1958), where a sand lease operation was condemned and there were no comparable sales, we held that it was proper to consider the intrinsic value of the property and its value to the owner for his special purposes. In *City of Wichita v. Unified School District No. 259,* 201 Kan. 110, 439 P.2d 162 (1968), we held that school buildings and other special purpose properties are not ordinarily traded on the market, and therefore an approach other than market data must be taken. We approved a judgment for the replacement cost of the buildings and noted that in eminent domain proceedings against a public body, depreciation may not be deducted.

In 4 Nichols, Eminent Domain (3rd Ed.) § 12.32 (1), p. 12-542, we find this commentary:

"It has been said that if the character of the property absolutely precludes any ascertainment of the market value, consideration may be given not only to the value peculiar to the owner, but to the cost of cure, replacement cost minus depreciation, capitalized cost of inconvenience, or any other manner which would be a fair method from eminent domain."

Appellant does not suggest that the income approach or some other method should have been used. It appears to us that, under the peculiar circumstances of this case, the depreciated replacement cost method was properly used in an effort to arrive at the value of the total taking. Had the city's witnesses reversed their testimony and given the overall value first and the breakdown later, the result would have been the same. We conclude that the method used was in this instance proper. The separation of the building and land values was reasonable under the circumstances, and did not have any demonstrable prejudicial effect.

Proper instruction was given to the jury to consider all the facts actually bearing on value not as separate items, but only as they as a whole affect market value. Counsel had ample opportunity on cross-examination to inquire into the testimony in order to ascertain that the witnesses had given full consideration to all matters contributing to the value of the property as a whole.

We have not overlooked the cases relied upon by the landowner; *Rostine; Hoy; Reiter v. State Highway Commission,* 177 Kan. 683, 281 P.2d 1080 (1955); *Case v. State Highway Comm.,* 156 Kan. 163, 131 P.2d 696 (1942); and *Saathoff v. State Highway Comm.,* 146 Kan. 465, 72 P.2d 74 (1937). We recognize the market data approach, coupled with the unit rule, as the usual, customary, and ordinarily appropriate method of establishing the value of property taken by eminent domain. However, we recognize also that there are rare exceptions and we find such an exception in the proceeding before us.

The cases just cited, excepting *Rostine,* were all decided before January 1, 1964, the effective date of both the code of civil procedure, K.S.A. 60-101 *et seq.,* and the eminent domain procedure act, K.S.A. 26-501 *et seq.* As we observed in *Lee:*

"Under the provisions of [K.S.A. 26-508,] an appeal taken from an award in a condemnation action 'shall be docketed as a civil action [in the district court] and tried as any other civil action.' . . .

"The new code of civil procedure incorporated Article 4, which is the uniform code of evidence, and it is thereby made applicable to the trial of condemnation actions.

. . . .

"Under K.S.A. 60-407 all evidence is admissible if it is relevant to the issue being investigated. This provision is said to have abolished the exclusionary rules of evidence existing prior to the passage of the new code of civil procedure. . . .

. . . .
"The *Jennings* case [199 Kan. 621, 433 P.2d 351 (1967)] clearly suggests that condemnation cases in which exclusionary rules of evidence were applied prior to the passage of the new code of civil procedure are no longer reliable." (207 Kan. at 290-291.)

Whether the unit rule be construed as a rule of evidence or as one of substantive law (and it has the attributes of both), it is clear that it does not apply when either the depreciated replacement cost or the capitalization of income method of valuation is employed. The testimony of the city's experts as to replacement cost less depreciation was proper. It was relevant to the central issue, that of just compensation to be paid for the land taken. K.S.A. 26-508. Upon review of the entire record we conclude that no prejudicial error occurred in the reception of the valuation testimony.

Appellant next contends that the trial court erred in admitting defendant's exhibits, photographs taken five months after the date of taking, for the reason that these photographs did not accurately reflect the condition of the property at the time of the taking. In the interim, plaintiff had removed his manufacturing equipment from the factory, and interior views of that building showed only bare walls, with some trash and debris scattered about. Four exterior views, showing three of the buildings, also show some rubble which plaintiff contends was not there on the date of taking.

The photographs were admitted after there was testimony that the pictures fairly and accurately portrayed the property on the date of taking. The machinery was not condemned, and plaintiff quite properly removed it from the premises. The photographs of the interior showed clearly the construction of the building. We think any changes could be and no doubt were adequately pointed out to the jury.

That photographs accurately portraying what they purport to show are admissible in evidence is universally recognized and needs no further discussion. It is only when photographs are distorted, inaccurate, or are otherwise unfair, that they are objectionable. Ordinarily the admissibility of photographs rests within the sound discretion of the trial court. *Kirsch v. Dondlinger & Sons Construction Co., Inc.,* 206 Kan. 701, 708, 482 P.2d 10 (1971); and see *City of Wichita v. Jennings,* 199 Kan. 621, 433

P.2d 351 (1967). We find no abuse of discretion and no prejudicial error in the admission of the exhibits in this case.

Finally, appellant claims that the trial court erred in permitting the city's last valuation witness, Swender, to testify about one "comparable" which he considered in arriving at his valuation of the land, after the court had ruled out all evidence of comparables. The landowner, in his direct testimony, stated that in seeking a new location, he considered a property on Osage Avenue, and was quoted a price of one dollar per square foot. Ellis used that figure in fixing the value which he put on his own property. In rebuttal, Mr. Swender was permitted to testify that another property on Osage Avenue, near the property considered by plaintiff, sold for thirty cents a square foot.

As we said in *Jacks v. Cloughley,* 203 Kan. 699, 703, 457 P.2d 175 (1969):

> "A trial judge is vested with considerable discretion in the matter of receiving rebuttal testimony. (*Bennett v. LaDoux,* 194 Kan. 216, 398 P.2d 590; and *State v. Neff,* 169 Kan. 116, 218 P.2d 248.) The ruling of the trial court will not be ground for reversal unless it appears that the discretion has been abused to the appellants' prejudice. (*State, ex rel., v. Stout,* 101 Kan. 600, 168 Pac. 853; and see K.S.A. 60-261.)"

The thirty-cent figure, multiplied by the footage of plaintiff's land, results in a figure considerably higher than the value put upon the land by Swender. Under all of the circumstances, and considering the landowner's testimony as to value per square foot, we hold that the trial court did not abuse its discretion in receiving Swender's rebuttal testimony.

The judgment is affirmed.

McFARLAND, J., dissents.