(603 P.2d 209)

No. 50,030

Urban Renewal Agency of the Wichita, Kansas, Metropolitan Area, *Appellant,* v. Gospel Mission Church and School, and Lee Etta Hampton, George Boston, and Mary Joe Johnston, Trustees of Gospel Mission Church and School, *Appellees.*

Petition for review denied January 29, 1980.

Opinion filed November 30, 1979.

*Phillip Mellor* of Mellor, Schaefer & Miller, P.A., of Wichita, for the appellant.

*Robert L. Howard* and *James M. Armstrong* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, for the appellees.

Before REES, P.J., SPENCER and SWINEHART, JJ.

SPENCER, J.: At issue in this case is the proper measure of compensation for the taking by condemnation of property owned and operated exclusively for religious and educational purposes on a nonprofit basis.

The Gospel Mission Church and School was located at 1545 North Wabash in Wichita. The property taken consisted of land, a dwelling house, and a structure housing the church sanctuary and a gymnasium. There is no issue in this court as to the land or the dwelling house. The sanctuary and gymnasium consisted of a large concrete block building which had been erected in two stages. The sanctuary portion was built to accommodate approximately 200 worshipers and contained separate rooms for the church office, choir, and restrooms. The gymnasium portion was equipped with kitchen facilities, restrooms, a storage deck, and basketball goals. The gymnasium was used on a regular basis for basketball games and served as a fellowship and banquet hall.

The Wichita church is the "mother church" of the Gospel Mission Church organization. Five other congregations are located in other states and twice a year general church meetings of the organization are held in Wichita. In addition to usual spiritual services, the church has for many years sponsored, and its members have conducted, supplemental schooling for all grade levels through high school. Students needing help with regular school work could obtain it at the church after school. It was admitted that the church building and gymnasium were completely functional at the time of taking and well served the congregation and community of which it was a part. It is also admitted that a comparable facility is necessary for the church to continue its function and operations for its members and the community.

Over the years, the building had, of course, depreciated and there was deferred maintenance. It is to be noted, however, that the church had been under threat of condemnation for four years prior to the actual taking. All are agreed that current building code requirements would necessitate substantially increased costs for any replacement facility. All are also agreed that church

property is not commonly bought and sold, and that the traditional market data approach for determining compensation is not available.

The court-appointed appraisers were instructed that compensation was to be determined as the amount needed to provide equivalent necessary replacements for the property taken, undiminished by depreciation or functional obsolescence. On appeal to the district court from the appraisers' award, the court adhered to this measure of compensation in its instructions to the jury. Based on expert testimony following this standard, the jury returned a verdict of $167,815.00. The Urban Renewal Agency of Wichita has appealed.

The sole issue on appeal is whether the trial court erred in applying the "substitute facilities" measure of compensation, *i.e.,* the amount needed to provide an equivalent necessary replacement facility undiminished by depreciation or functional obsolescence. The Agency contends that the proper measure is the "depreciated replacement cost" approach, *i.e.,* the cost to build an equivalent facility less depreciation as of the date of taking.

It is fundamental that private property shall not be taken or damaged for public use without just compensation. U.S. Const. 5th Amend.; K.S.A. 26-513(*a*). It is also the law of this state that, if the entire tract of land or interest therein is taken, the measure of compensation is the value of the property or interest at the time of the taking. K.S.A. 26-513(*b*).

The three generally accepted methods of valuing real property for purposes of condemnation are: (1) The market data approach based upon what comparable properties within the area have sold for at or near the time of taking; (2) the depreciated replacement cost or cost approach based upon what it would cost to acquire the land and to erect equivalent improvements, less depreciation; and (3) the income approach or capitalization of income based upon what the property taken is producing or is capable of producing in income at the time of the taking. *Ellis v. City of Kansas City,* 225 Kan. 168, 589 P.2d 552 (1979); *State Highway Commission v. Lee,* 207 Kan. 284, 485 P.2d 310 (1971). As stated in *Ellis,* the market data approach is by far the most commonly used method of appraisal and is the method which should be used when there have been sales of comparable properties in the same locale near the time of the taking. When, however, the

property is so unique that it has no ascertainable market and there are no sales of reasonably similar or comparable property, the other methods—depreciated replacement cost or capitalization of income—may be used. 225 Kan. at 172.

It is agreed that the value of the church sanctuary and gymnasium could not, in this instance, be determined by the traditional market data approach. Obviously, the capitalization of income method is inappropriate. However, there would appear to be no obstacle to determining value under the depreciated replacement approach advocated by the Agency. Despite this, the Church contends and the trial court ruled that when a condemnee is a "private owner of a non-profit public facility devoted to a special purpose," "just compensation" requires departure from the value standard and application of the substitute facilities method.

In its excellent brief filed with this court, the Church leans heavily on the case of *City of Wichita v. Unified School District No. 259*, 201 Kan. 110, 439 P.2d 162 (1968), and argues that our Supreme Court recognized and tacitly approved application of the substitute facilities doctrine to the taking of property held by a nonprofit charitable organization organized for public purposes when market data is not obtainable. In that case the court applied the substitute facilities method of compensation when public school property was taken to make way for an interstate highway. It was there held that, when property already devoted to public use by one agency of government is taken through condemnation proceedings by a different agency of government, the compensation due is such an amount as will provide equivalent necessary replacement for the property taken, and that factors of depreciation and functional obsolescence are not to be considered. The court made it clear, however, that the substitute facilities method is not another approach in determining value of property as a measure of compensation in condemnation proceedings.

"The cost of adequate substitutes necessary to replace public facilities taken in condemnation proceedings may be more or less than the value of the property taken." Syl. ¶ 6.

The rationale for departing from value as the measure of compensation in the case of a public condemnee was stated as follows:

"The status of a school district deprived by condemnation of its property differs radically from that of a private condemnee. A school district exists to further the

educational process, and when its school property has been condemned, it may not take its money and liquidate its operations. The district remains charged with the same public duty of providing educational facilities for its children as it had before its property was taken. And the cost of constructing substitute facilities is equally great whether those condemned were new or ancient." 201 Kan. at 116.

Substitute facilities need not duplicate those which have been taken, provided they are of equivalent utility, and where no replacement is required to restore a public agency to its prior state of efficiency in discharging its public functions, no more than nominal damages need be awarded. Syl. ¶ 7.

Even though it was established that the church facilities consisted of properties not ordinarily traded on the market and the market data approach was not therefore available, the fact remains that here we are concerned with private property for which the Church is entitled to just compensation based on the value of the property at the time of the taking. K.S.A. 26-513. It may be noted that for the Church to continue to serve its congregation and community in the same manner as before the taking, a comparable facility may be necessary. However, there is no requirement beyond good intentions that it do so.

The recent case of *United States v. 564.54 Acres of Land*, 441 U.S. 506, 60 L.Ed.2d 435, 99 S.Ct. 1854 (1979), is persuasive. There the object of the condemnation was a nonprofit summer camp owned and operated by the Lutheran Church. That case is factually different from the one at bar in that there it was concluded a sufficient market existed to allow application of the market data approach to determine value. However, the court does discuss whether application of the substitute facilities approach is required for "just compensation," *i.e.*, "whether an award of market value would diverge so substantially from the indemnity principle as to violate the Fifth Amendment." 441 U.S. at 513. In determining that it would not, the court addressed issues which are also advanced by the Church in the case at bar: (1) The fact that new facilities will bear financial burdens imposed by regulations to which existing facilities are not subject, which might preclude continuation of the owner's use, does not require divergence from normal valuation methods. It was noted that it is not at all unusual that property uniquely adapted to the owner's use has a market value on condemnation which falls far short of enabling the owner to preserve that use. Yet, nontransferable values arising from the owner's unique need for the

property are not compensable. (2) A nonprofit organization may be distinguished from a business enterprise, since commercial property can be valued by the capitalized income approach. But there is no reason to treat a nonprofit public oriented organization differently from private homeowners or other non-commercial property owners who neither derive earnings from their property nor hold it for investment. Just compensation does not mandate a government subsidy for nonprofit organizations nor does a non-profit status require rejection of the market value standard. (3) The substitute facilities approach applied to public condemnees is based on the condemnee's legal or factual obligation to replace the facilities. It does not apply to a private condemnee which is "free to allocate its resources to serve its own institutional objectives, which may or may not correspond with community needs." 441 U.S. at 515. Awarding replacement cost on the theory that the condemnee would continue to operate for a public purpose as before the taking would provide a windfall if substitute facilities were never acquired or, if acquired, were later sold or converted to another use. (4) The fact that the facilities might have benefited the community is not relevant in assessing the compensation due a private condemnee. A private entity does not hold its property as the public's trustee and is not entitled to be indemnified for the public's loss.

The fact that *564.54 Acres of Land* is concerned with market value as opposed to value determined under the depreciated replacement cost approach does not serve to distinguish the reasoning. As has been noted, market data is but one approach recognized in Kansas to determine value, and value at the time of taking is the measure of compensation mandated by our statutes for the taking of private property. As has also been noted, the substitute facilities method of compensation is not a method of determining value and its application to public condemnees is based on the unique character and the use being made of public property. We hold the substitute facilities method of determining compensation in eminent domain proceedings to be applicable only in such proceedings against a public entity and it was error to apply that method in this case.

The Church adds one argument not explicitly addressed in *564.54 Acres of Land.* It contends that, if the substitute facilities method is not applied, it will be forced to close its doors because

of lack of sufficient funds to construct new facilities, and that the First Amendment rights of the Church members will therefore be infringed. The counter-argument, of course, is that if the only reason for applying the substitute facilities method to this private condemnee is that it is a religious organization, the proscription against assisting the establishment of religion will be breached. As was noted in the concurring opinion in *United States v. 564.54 Acres of Land, More or Less,* 576 F.2d 983, 999 (3d Cir. 1978), *rev'd* 441 U.S. 506, 60 L.Ed.2d 435, 99 S.Ct. 1854 (1979):

> "Where church-owned property is involved, constitutional obstacles present themselves no matter which narrow path we choose to follow. Attempts to supervise the use of the condemnation award will run afoul of the First Amendment's entanglement proscription. Thus, there is no way to insure that an award premised on use for substitute facilities will not be pocketed. Yet, in addition to offending our sense of fairness, any system of compensation which results in a windfall to the property owner may well violate the constitutional command that the government not aid religion.
>
> "But more fundamentally, when the condemned facility belongs to a religious organization, it is the inquiry which is [at] the very heart of the determination that the condemnee is entitled to the cost of substitute facilities which is obnoxious under our constitutional framework. The judge or jury has no right to pass on the 'benefit' or the 'necessity' to the community of such installations."

The Supreme Court did not discuss the First Amendment implications of applying the substitute facilities doctrine to property owned by a church, but it did note as an additional reason for denying the doctrine to private condemnees, generally, that to make the measure of compensation depend on a jury's subjective estimation of whether a particular use "benefits" the community would conflict with efforts to establish a relatively objective standard of valuation. See also *Wilmington Hous. Auth. v. Greater St. John Bapt. Ch.,* 291 A.2d 282 (Del. 1972); *City of Baltimore v. Concord,* 257 Md. 132, 262 A.2d 755 (1970).

Having determined that this case must be reversed on the issue of measure of compensation, we turn to the disposition of the matter on remand. It is argued on behalf of the Church that, if it is determined that depreciation is a proper factor to consider, this case should be remanded for the purpose of taking evidence on that issue alone, the jury having already determined the cost of a replacement facility. On the other hand, the Agency argues that it will not suffice simply to have the court determine the appropriate amount of depreciation and reduce the jury's verdict accordingly, noting that the testimony adduced at trial pertains to the cost of

construction of a new facility, undiminished by depreciation or functional obsolescence.

The record before us reveals that both parties presented evidence as to the cost of a replacement facility, and it is agreed that the verdict returned by the jury is supported by competent evidence. Appellant has stipulated that this appeal tests only the trial court's ruling as to the proper measure of damages and whether replacement cost should be reduced by depreciation factors. We find no justification for a new trial on all issues, but rather that the trial court should receive and consider evidence on the limited issues of depreciation and functional obsolescence of the church property, if any, and reduce the jury's award of compensation accordingly.

Reversed and remanded for new trial on the limited issues of depreciation and functional obsolescence.