(626 P.2d 228)

No. 51,385

In the Matter of the Condemnation of Land for WHITEWATER RIVER WATERSHED JOINT DISTRICT NO. 22, *Appellee,* v. BUTLER RURAL ELECTRIC COOPERATIVE ASSOCIATION, INC., *Appellant.*

Opinion filed April 10, 1981.

*Robert M. Green,* of El Dorado, for appellant.

*Gregory C. Nye* and *Arnold C. Nye,* of Nye & Nye, of Newton, for appellee.

Before ABBOTT, P.J., REES and MEYER, JJ.

ABBOTT, J.: This is an appeal by the condemnee, Butler Rural Electric Cooperative Association, Inc., (Rural Electric) from a judgment awarding it damages of $2,058 from the condemnor, Whitewater River Watershed Joint District No. 22 (Watershed District). Rural Electric contends it is entitled to the full cost of an adequate line to replace the one affected by the taking.

The dispositive facts are basically undisputed. The Watershed District adopted a plan for the construction of watershed structures in the district, including site No. 18 which is the subject matter of this appeal. The dam at site No. 18 will cause some permanent impoundment of water and from time to time will flood the base of fifteen poles used in the Rural Electric distribution system. The electric distribution line involved serves between 70 and 75 rural electric consumers who live in the southeast portion of Harvey County and the northwest portion of Butler County, Kansas. The electric distribution line runs east-west along a section line north of the dam, then turns north and runs north along that section line. Six poles along one section line and nine poles in the other area will be affected. Watershed District commenced condemnation proceedings against Rural Electric, seeking the right to temporarily flood and submerge the base of the power poles in question and to take Rural Electric's right to install poles in the permanent impoundment which lies below 1379.9-foot elevation. Appraisers were appointed and, based on what the parties recognize as obviously erroneous instructions that are not in issue on appeal, awarded damages to Rural Electric of $6,000. Watershed District appealed the award and the case was tried to the district court.

Evidence was presented as to the elevation of the poles, the frequency and depth of flooding, the various solutions available and their costs. The case was tried on the basis that the line could remain in its same location by replacing fifteen poles with longer and larger ones, or it could be rebuilt in a different location. The existing wires will be used if the line is raised, but the fifteen existing poles must be replaced. The cost of rebuilding the line in a different location would cost nearly three times more than it would cost to raise the height of the existing line. The appraisers and trial court all found that it would be more economical to raise the existing line and awarded damages on that basis. Rural

Electric argues that that was error and it should be awarded the cost of rebuilding the line around the impoundment area. Rural Electric also maintains the trial court erred in computing damages for the cost of raising the line.

The basic figures used by both parties' witnesses originated with Rural Electric's expert witness, Emmett Green, who is an electrical engineer with Allgeier, Martin & Associates, Inc. Green computed what it would cost to remove the fifteen existing poles and replace them with longer and stronger poles, including the addition of some new hardware not now being used on the shorter poles. Green's report estimated the cost of replacement at $5,742, plus engineering fees and overhead of $1,148, for a total of $6,890. He testified at trial that those figures would need to be increased by five percent to compensate for inflation between the date of the report and the date of taking. Two of the three appraisers testified that they used Emmett Green's figures in arriving at their award of $6,000.

Watershed District's only witness as to the amount of damages was Lloyd W. Shank, a retired director of utilities and chief engineer for the Kansas Corporation Commission. Shank testified rather extensively concerning accounting principles involved, and at various places in his testimony stated what he considered to be the proper legal method of awarding damages in order to avoid non-betterment. Shank computed Rural Electric's damages by accepting Green's figures as to the cost of removing and replacing poles. To avoid non-betterment, he proposed that the difference between the current cost to install the existing poles and the cost to install larger and longer poles, plus the cost of removing the existing poles, be awarded to Rural Electric as its damages. He made no allowance for crossbars, groundwires and miscellaneous items totaling $1,694 included in Green's figures (and his) on the theory those items were improvements to the existing line. Nor did he make any comment on the five percent increase for inflation that Green testified would be necessary to bring the figures current as of the date of taking. As we view Shank's testimony, it appears he accepted Green's figures, expressed his opinion as to how damages should be computed and arrived at a figure of $2,058.

The trial judge in effect awarded damages for only the top portion of the poles. Each pole to be replaced is 35 feet in length,

and the trial judge deducted the installed unit price of $120 from the installation cost of a taller and larger pole. Rural Electric is thus forced to pay $120 for each new pole to be installed. Admittedly, it will have the 35-foot poles that are removed; however, the record contains no evidence of the salvage value, if any, of a used pole. Other equipment apparently necessitated by the longer and larger poles is forced upon Rural Electric without compensation.

We first dispose of Rural Electric's argument that merely raising the line in an area subject to infrequent flooding over various periods of time is not an adequate substitute. Rural Electric makes a persuasive argument as to why the line should be relocated. The fact remains, however, that Rural Electric's own expert witness testified that raising the line is feasible and permissible under existing codes and Kansas Corporation Commission rules and regulations, and he himself proposed it as a viable alternative to relocating the line. The trial court found for Watershed District on this issue, and substantial and competent evidence exists to support that finding.

As we view Watershed District's argument, it advocates the use of the depreciated replacement method modified by the non-betterment cost rule espoused by Mr. Shank, which appears to be an accounting method and not a reasonable method of awarding damages. Rural Electric opts for yet another alternative—the substitute facilities approach. This method of determining compensation was defined in *City of Wichita v. Unified School District No. 259*, 201 Kan. 110, Syl. ¶¶ 3-8, 439 P.2d 162 (1968):

"Where property already devoted to public use by one agency of government is taken, through condemnation proceedings, by a different governmental agency, the compensation due the former is such an amount as will provide equivalent necessary replacements for the property so taken."

"The rule requiring compensation in sufficient amount to provide needed equivalent replacements is applicable to buildings and land alike."

"In computing the replacement value of public buildings taken in condemnation proceedings, factors of depreciation and functional obsolescence are not to be considered."

"The cost of adequate substitutes necessary to replace public facilities taken in condemnation proceedings may be more or less than the value of the property taken."

"Substitute facilities need not actually duplicate those which have been taken, provided they are of equivalent utility, and where no replacement is required to restore a public agency to its prior state of efficiency in discharging its public functions, no more than nominal damages need be awarded."

"The true test of the adequacy of substitute facilities provided to replace public property taken in eminent domain proceedings is whether they restore the over-all capacity of the system to the same state of readiness and utility as it possessed prior to the taking."

The purpose of the cost of substitute facilities doctrine is to ensure that sufficient damages will be awarded to finance a replacement for the condemned public facility; as a result, depreciation is not deducted from the award or the public would be deprived of its right to be made whole. Note, *Cost of Substitute Facilities,* Duke L.J. 1133 (1975). A panel of this court recently had occasion to scrutinize the circumstances under which the substitute facilities method can be applied. In *Urban Renewal Agency of Wichita v. Gospel Mission Church,* 4 Kan. App. 2d 101, 603 P.2d 209 (1979), *rev. denied* 227 Kan. 928 (1980), it was stated at pages 104-06:

"In its excellent brief filed with this court, the Church leans heavily on the case of *City of Wichita v. Unified School District No. 259,* 201 Kan. 110, 439 P.2d 162 (1968), and argues that our Supreme Court recognized and tacitly approved application of the substitute facilities doctrine to the taking of property held by a nonprofit charitable organization organized for public purposes when market data is not obtainable. In that case the court applied the substitute facilities method of compensation when public school property was taken to make way for an interstate highway. It was there held that, when property already devoted to public use by one agency of government is taken through condemnation proceedings by a different agency of government, the compensation due is such an amount as will provide equivalent necessary replacement for the property taken, and that factors of depreciation and functional obsolescence are not to be considered. The court made it clear, however, that the substitute facilities method is not another approach in determining value of property as a measure of compensation in condemnation proceedings.

" 'The cost of adequate substitutes necessary to replace public facilities taken in condemnation proceedings may be more or less than the value of the property taken.' Syl. ¶ 6.

"The rationale for departing from value as the measure of compensation in the case of a public condemnee was stated as follows:

" 'The status of a school district deprived by condemnation of its property differs radically from that of a private condemnee. A school district exists to further the educational process, and when its school property has been condemned, it may not take its money and liquidate its operations. The district remains charged with the same public duty of providing educational facilities for its children as it had before its property was taken. And the cost of constructing substitute facilities is equally great whether those condemned were new or ancient.' 201 Kan. at 116.

Substitute facilities need not duplicate those which have been taken, provided they are of equivalent utility, and where no replacement is required to restore a

public agency to its prior state of efficiency in discharging its public functions, no more than nominal damages need be awarded. Syl. ¶ 7.

. . . .

". . . A nonprofit organization may be distinguished from a business enterprise, since commercial property can be valued by the capitalized income approach. But there is no reason to treat a nonprofit public oriented organization differently from private homeowners or other non-commercial property owners who neither derive earnings from their property nor hold it for investment. Just compensation does not mandate a government subsidy for nonprofit organizations nor does a nonprofit status require rejection of the market value standard. (3) *The substitute facilities approach* applied to public condemnees *is based on the condemnee's legal or factual obligation to replace the facilities.* It does not apply to a private condemnee which is 'free to allocate its resources to serve its own institutional objectives, which may or may not correspond with community needs.' [*United States v. 564.54 Acres of Land*] 441 U.S. at 515. Awarding replacement cost on the theory that the condemnee would continue to operate for a public purpose as before the taking would provide a windfall if substitute facilities were never acquired or, if acquired, were later sold or converted to another use. (4) The fact that the facilities might have benefited the community is not relevant in assessing the compensation due a private condemnee. A private entity does not hold its property as the public's trustee and is not entitled to be indemnified for the public's loss.

"The fact that *564.54 Acres of Land* is concerned with market value as opposed to value determined under the depreciated replacement cost approach does not serve to distinguish the reasoning. As has been noted, market data is but one approach recognized in Kansas to determine value, and value at the time of taking is the measure of compensation mandated by our statutes for the taking of private property. As has also been noted, the substitute facilities method of compensation is not a method of determining value and its application to public condemnees is based on the unique character and the use being made of public property. We hold the substitute facilities method of determining compensation in eminent domain proceedings *to be applicable only in such proceedings against a public entity* and it was error to apply that method in this case." (Emphasis supplied.)

Should the substitute facilities rule apply in the present case? The answer to this question hinges on whether Rural Electric can be considered a public entity within the meaning of the cases. At first glance, it appears Rural Electric is not a public entity, although unquestionably it possesses the right of eminent domain. See K.S.A. 1980 Supp. 17-4604(*j*). It is not a government agency per se, nor is it supported by tax revenues. The fact that an electric co-op is by statute a nonprofit corporation (K.S.A. 17-4602) does not of itself entitle it to the application of the substitute facilities doctrine. *United States v. 564.54 Acres of Land,* 441 U.S. 506, 514-15, 60 L.Ed.2d 435, 99 S.Ct. 1854 (1979); *Urban Renewal Agency of Wichita v. Gospel Mission Church,* 4 Kan.

App. 2d at 106. See also Annot., 40 A.L.R.3d 143, § 1[a] n. 3. The Supreme Court of Kansas recently indicated that a water district is a public entity. In *Dedeke v. Rural Water Dist. No. 5,* 229 Kan. 242, 249, 623 P.2d 1324 (1981), the court stated:

"Under Kansas law, a rural water district is a creature of statute (K.S.A. 82a-612 *et seq.*). It is incorporated as a quasi-municipal corporation by declaration of the board of the commissioners of the county in which the water district is located (K.S.A. 82a-616). The powers of a rural water district are prescribed by statute (K.S.A. 1980 Supp. 82a-619). It has been granted the power of eminent domain. In law and in fact, a rural water district exercises the powers of a public utility. It is subject to state regulation and control. The owner of a benefit unit certificate issued by a rural water district is the owner of a property interest protected by the requirements of due process."

A water district is organized and incorporated by a board of county commissioners (K.S.A. 82a-612 *et seq.*), whereas an electric co-op is formed by its patrons. That is the only significant difference enumerated in *Dedeke* between a water district and an electric co-op existing pursuant to K.S.A. 17-4601 *et seq.* We might be justified in extending the doctrine in *City of Wichita v. Unified School District No. 259,* 201 Kan. 110, to rural electric co-ops such as Rural Electric. We do not believe that to be necessary, however, as an in-depth analysis of the reason *behind* the rule set forth in *City of Wichita* leads to the same result. In *Urban Renewal Agency of Wichita v. Gospel Mission Church,* 4 Kan. App. 2d at 106, it was stated:

"The substitute facilities approach applied to public condemnees is based on the condemnee's legal or factual obligation to replace the facilities. It does not apply to a private condemnee which is 'free to allocate its resources to serve its own institutional objectives, which may or may not correspond with community needs.' [*United States v. 564.54 Acres of Land*] 441 U.S. at 515. Awarding replacement cost on the theory that the condemnee would continue to operate for a public purpose as before the taking would provide a windfall if substitute facilities were never acquired or, if acquired, were later sold or converted to another use."

See *City of Wichita v. Unified School District No. 259,* 201 Kan. at 116. The church in *Urban Renewal* had no requirement beyond good intentions to construct a comparable facility. 4 Kan. App. 2d at 105. Here, however, Rural Electric has a statutory duty to replace the "taken" poles. K.S.A. 17-4630 (now 1980 Supp.) stated:

"Cooperatives doing business in this state pursuant to this act shall be subject to the jurisdiction and control of the corporation commission of this state as pro-

vided in chapter 66, General Statutes of Kansas of 1935 as amended as applying to electric utilities, except as to issuance of securities."

K.S.A. 66-1,173 states in pertinent part:

"Every retail electric supplier shall have the exclusive right and responsibility to furnish retail electric service to all electric consuming facilities located within its certified territory, and shall not furnish, make available, render or extend its retail electric service to a consumer for use in electric consuming facilities located within the certified territory of another retail electric supplier . . . ."

K.S.A. 1980 Supp. 17-4604(*d*) states in relevant part:

"[T]o generate, manufacture, purchase, acquire, accumulate and transmit electric energy, and to distribute, sell, supply, and dispose of electric energy to its members, and to governmental agencies, political subdivisions, and to other persons, who are not receiving central station service from facilities of existing public utilities . . . ."

Since Rural Electric has a statutory responsibility to maintain electric service to the people within its territory, and the parties agree that the loss of the fifteen poles would cut off the electric power to 70 to 75 homes, the cost of providing substitute facilities necessary to replace those that have been taken (undiminished by depreciation but less the salvage value of any equipment not reasonably reusable) should have been awarded, and the trial court erred in failing to do so. We believe such a holding to be in line with the rationale announced in *City of Wichita* and *Urban Renewal,* but not mandated by them. Each eminent domain case involving property, when the usual means of ascertaining market value are lacking, must to some extent be decided on its own peculiar set of facts so that the owner of the property taken is not required to make any pecuniary sacrifices. *Eisenring v. Kansas Turnpike Authority,* 183 Kan. 774, 779, 332 P.2d 539 (1958).

The non-betterment cost method adopted by the trial court in valuing the condemned poles was inappropriate since a condemnee is ordinarily entitled to receive compensation that would put it in as good a position pecuniarily as if its property had not been taken. *City of Wichita v. Unified School District No. 259,* 201 Kan. at 116-17. Furthermore, research indicates no authority by either the legislature or the Kansas Corporation Commission to support this type of valuation in a condemnation proceeding. We disagree with Watershed District's contention that the substitute facilities method was not raised at trial, as Rural Electric specifically directed the trial court's attention to *City of Wichita.*

On retrial, the trial court should make a specific finding as to the necessity for engineering expenses to raise the line; and if engineering expenses are necessary, such sum as Rural Electric reasonably incurs in raising the line should be awarded.

This case should not be construed as one to require the payment for new substitute facilities in every case. For example, if in this case the same equipment could be reused and all that would be necessary is to move the line, then the damages would be the cost of moving the line plus any incidental damages.

Reversed and remanded with directions to grant a new trial on the issue of the cost of substitute facilities, less salvage value of the shorter poles that are replaced and any other equipment not reasonably reusable in raising the line.