No. 78,259

In the Matter of the Acquisition of Property by Eminent Domain. CITY OF OVERLAND PARK, KANSAS, A Municipal Corporation, *Plaintiff*, v. DALE F. JENKINS REVOCABLE TRUST, *Appellant*, and ALLEN A. NEWELL, *Appellee.*

(949 P.2d 1115)

Opinion filed December 12, 1997.

*Frank H. Jenkins, Jr.*, of Lowe, Farmer, Bacon & Roe, of Olathe, argued the cause and was on the briefs for appellant.

*James B. Jackson*, of Kansas City, Missouri, argued the cause, and *Joseph R. Borich, III*, of Leawood, was with him on the brief for appellee.

The opinion of the court was delivered by

WAHL, J.: This appeal involves a dispute between a lessor and a lessee over the proper apportionment of a condemnation award resulting from an eminent domain action.

On November 30, 1995, the City of Overland Park filed a petition to condemn several tracts of land for the purpose of acquiring rights-of-way and easements for the construction and the improvement of the intersection of 151st Street and Metcalf Avenue. One of the condemned tracts included real estate and improvements owned by the appellant, Dale F. Jenkins Revocable Trust (Jenkins). Appellee Allen A. Newell (Newell), a barber shop owner, was the lessee of part of this tract. Newell's barber shop was a one-man, three-chair operation leasing 340 square feet in a commercial building on the tract. In his answer to the condemnation petition, Newell stated he was a tenant with a valid lease having a bonus value under Kansas condemnation laws, which lease had to be acquired with fair market value being awarded to Newell plus interest, moving, and relocation expenses.

As part of the construction project, it was necessary to demolish the improvements on the tract, including the commercial building and a car repair shop. As a result of the condemnation, each of the commercial leases was terminated and each tenant was released from any obligation for further payment of rent as of the date of taking.

In due course, the district court entered an order appointing appraisers and setting a time for filing of the appraisers' report. On February 22, 1996, the appraisers filed a report appraising the tract in question in the amount of $175,500. The district judge entered an order approving the appraisers' report on the same day.

Pursuant to K.S.A. 26-517, Newell filed a motion requesting the district court to apportion the appraisers' award of $175,500 among the lessor, Jenkins, and the lessees. Newell was the only tenant asserting a claim for the market value of the unexpired term of the lease. The district court conducted hearings pursuant to K.S.A. 26-517, which provides:

"In any action involving the condemnation of real property in which there is a dispute among the parties in interest as to the division of the amount of the appraisers' award or the amount of the final judgment, the district court shall, upon motion by any such party in interest, determine the final distribution of the amount of the appraisers' award or the amount of the final judgment."

The Eminent Domain Procedure Act, K.S.A. 26-501 *et seq.*, provides for bifurcated proceedings in determining compensation. Under the "undivided fee rule" followed in Kansas, the total award for the condemned property is determined in the first proceeding, without consideration of the competing demands of the various holders of interests in the land. Thereafter, if various parties in interest cannot agree among themselves as to the division of that award, the court allocates the award pursuant to K.S.A. 26-517. See *City of Manhattan v. Kent*, 228 Kan. 513, 519, 618 P.2d 1180 (1980). As for the valuation of leasehold interests in eminent domain proceedings, K.S.A. 26-517 does not provide guidelines for the division of the condemnation award among the parties in interest.

In order to understand their positions, it is helpful to detail the contentions of Newell and Jenkins. At the apportionment hearing, Newell testified that, as a result of the condemnation, he had to move his barber shop 4.6 miles west of Stanley to Olathe. Newell's original Stanley lease was for a term of 1 year from November 1, 1990, to October 31, 1991, for $11.11 per square foot. The rent increased to $11.56 per square foot in 1991, $12.22 in 1993, and $14.81 in 1996, and would increase to $15.99 in 1998 and $17.40 in 2000. His Stanley shop was a three-chair barber shop and measured 340 square feet. He shared parking, restrooms, and the hallway with other tenants. His rent was $330 per month plus his share of the utilities. He stated the primary attributes of the Stanley lease were its size, which perfectly suited his needs, its location at a busy intersection, and the lengthy term of the lease.

Newell testified that as soon as he was informed that he would have to vacate the commercial building, he began to search for another location in the Stanley area but he could not find a lease with the same terms as the Stanley lease. He was unable to obtain a lease in the new Stanley Price Chopper shopping center or at Stanley Station, another shopping center, because both centers already had barber shops and no-compete clauses prevented these shopping centers from leasing space to a second barber shop. Newell stated he investigated the possibility of purchasing an older house, but found it to be financially prohibitive. He also examined

several other lease possibilities in the Stanley area, but either the term was too short or the space was larger than he needed. It was Newell's opinion that the Stanley lease was the exact size he wanted, the price was "great," and the location was "terrific."

Newell was unable to find a lease for 350 square feet, which was all that he required for his shop. Instead, he had to lease 1,100 square feet at the Olathe location for a total of $11 per square foot. Newell stated that, despite the additional space, he only had the same three barber chairs he had in his Stanley location. He stressed that he had blocked off the unused space and had no intention of expanding his business.

Newell testified his Olathe location was the smallest and best location he could find. His new location had better parking. He had one restroom of his own in the new location, while he had two communal restrooms in the Stanley location. When asked whether the new location was "far superior" to the old, Newell responded that the building was newer, but the location was not as good because considerable traffic passed by his shop every day in Stanley, while in Olathe, he was located in a developing residential area with much lighter traffic. He agreed that the appearance of the new building was superior and that access was a little better.

Clark Scroggin, a commercial real estate appraiser, testified for Newell. He stated he examined other comparable properties in the area to ascertain a market level of rent, examined the contract rent for the Stanley and Olathe leases, and made comparisons between those and other comparable rentals in the market. He also reviewed comparables used by Jenkins' expert real estate appraiser and found the new Olathe lease to be in the same geographic area and generally similar in nature to the marketplace in Stanley.

In analyzing the Stanley lease, Scroggin stated: "The most unique thing about [the Stanley lease] was that it was approximately 300 sq. ft., which is virtually impossible to find anywhere in the market and certainly not available in the subject neighborhood." He also found it unique that Newell could rent a small space for such a long term.

Scroggin performed a market data study of existing leaseholds, including the Olathe leasehold, to determine a market level of rent,

and he determined that the Olathe leasehold was the most accurate for comparison purposes. Scroggin stated that he performed an analysis to compare the contract rent of the Stanley lease to the market rent, then abstracted the difference and abstracted it to a present worth based upon an 8% discount rate.

Scroggin testified that the present worth of the Stanley lease was $24,201 and the present worth of the Olathe lease was $64,823. He stated in his report that Newell had a very favorable lease in place in Stanley which could not be matched in the current marketplace.

Scroggin also testified that the other Stanley comparable leases he researched were equivalent to Newell's Olathe lease. He concluded that the rent for the Olathe shop was equivalent to market rent in Stanley. He also used the Olathe lease as a comparable because the rent there was lower than the rent at Price Chopper and Stanley Station. He stated he considered the Stanley lease far superior to Olathe in location but inferior in construction and condition. Scroggin testified that the parking ratio at the two locations was about the same. When asked if he had assigned any percentage adjustment for these various factors, Scroggin stated:

> "No. My conclusion was that the inferior aspects, the construction type, and the condition of the property would offset the superior nature of the location, and so I have used those figures as they are. . . . I made adjustments. The net adjustment was zero, so the unadjusted rent would be the same as the adjusted."

Bruce Baker, a real estate expert, also testified for Newell. He noted that the most striking attribute of the Stanley lease was its location at the corner of 151st and Metcalf, the length of the lease, and the rental rate.

Kevin Nunnink, a real estate appraiser, testified for Jenkins. He reviewed comparable rental properties and stated that he compared the contract rent of Newell's Stanley lease to the market rent and concluded that there was no benefit of the bargain to Newell and that Newell's leasehold was of no value. Nunnink only used comparables in Stanley for his appraisal. Nunnink's first comparable was 1,000 square feet at a rental rate of $11 per month, and his second was 1,200 square feet at a rate of $10.72 per month.

His third comparable lease was 3,878 square feet. Nunnink testified that since the contract rate of Newell's lease over the entire term of the Stanley lease was $14.17 and the range for market rent in Stanley was between $10 and $11 per square foot, there was no benefit to Newell and no positive leasehold interest in the Stanley lease. Nunnink did not include in his analysis the point that the $14.17 contract rate for the Stanley lease was calculated over the long-term life of the lease to the year 2002 while his calculation of the contract rate for his other comparables focused only on the rent in 1996. Nunnink also testified that Newell's new lease provided additional utility due to its larger size. Nunnink did not address the facts that Newell was forced to lease larger space than he ever intended to use and that he had blocked off the excess space.

After hearing the testimony, the district court made extensive findings of fact and concluded:

"16. At the apportionment hearing on the 26th of May, 1996, Clark Scroggin, Kansas General Real Estate Appraiser Certification #G-1049 and MAI Candidate, testified as an expert witness on behalf of Mr. Newell. After an exhaustive market study, Mr. Scroggin evaluated the market value of Mr. Newell's lease and found the lease's uniqueness which made it valuable in the market place due to its size (300 square feet); location (151st Street and Metcalf Avenue northeast direct corner); term (until October 31, 1991); and price (starting at $330.00 a month). Based upon these high qualities, the best comparable is Mr. Newell's new location on Blackbob. Taking those factors, as well as other factors in the marketplace, Mr. Scroggin's damages in the amount of $40,600.00 were arrived as follows under traditional appraisal techniques.

"17. The Court has carefully considered Mr. Nunnink's comparables for the Newell operation. The properties cited, however, were considerably larger than 300 square feet space leased by Mr. Newell and not otherwise properly suited for a barber shop operation. Accordingly, the Court finds that the Newell lease is unique and no comparable locations were reasonably available to Mr. Newell upon condemnation of the subject property."

The district court then ordered apportionment granting $40,600 to Newell and $134,900 to the Trust.

On appeal, Jenkins argues that the district court failed to apply the proper method of valuation in determining the value of Newell's leasehold interest and asks this court to reverse the judgment of the district court and remand the case for a new trial. The proper

method of valuation is a question of law and subject to review on appeal. *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 91, 774 P.2d 962 (1989). Our review of questions of law is unlimited. See *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

Jenkins contends that the district court improperly used the substitute facilities method of valuation. This method is defined as the amount needed to provide an equivalent necessary replacement facility, undiminished by depreciation or functional obsolescence. Although it is a recognized measure of compensation in condemnation cases, the court has held it is applicable only to public condemnees such as churches or schools because of the unique character and use being made of the public property. See *Whitewater River Watershed v. Butler Rural Electric Coop Ass'n Inc.*, 6 Kan. App. 2d 8, 626 P.2d 228 (1981); *Urban Renewal Agency of Wichita v. Gospel Mission Church*, 4 Kan. App. 2d 101, 603 P.2d 209 (1979), *rev. denied* 227 Kan. 928 (1980). In *City of Wichita v. Unified School District No. 259*, 201 Kan. 110, 439 P.2d 162 (1968), we held that school buildings and other special purpose properties are not ordinarily traded on the market and, therefore, an approach other than market data must be taken. We approved a judgment for the replacement cost of the buildings and noted that in eminent domain proceedings against a public body, depreciation may not be deducted. 201 Kan. at 112-16.

Jenkins' position is that since the district court awarded Newell an amount essentially equal to the difference between the present value of the cost of the unexpired term of the Stanley lease and the present value of the cost of the Olathe lease for the same period of time, the district court used the substitute facilities method of valuation. Jenkins maintains the proper method of valuation of a private leasehold estate in condemnation cases is not the substitute facilities method but rather the market value method by which the condemnee is awarded the market value of the unexpired term of the lease over and above the rent stipulated to be paid. Jenkins claims a close examination of the damage calculations resulting in $40,600 reveals that the district court applied a measure of compensation based upon the cost of replacing the Stanley lease with the Olathe lease.

Jenkins also takes issue with the district court's reliance on the fact that similar leases were not available to Newell in Stanley. Jenkins further claims the Scroggin appraisal made no adjustments for depreciation, age, quality, or size. Jenkins contends that, even though the testimony was uncontroverted that Newell has blocked off the additional space in Olathe, and has no plans or desire to expand his business, he has the opportunity to utilize the additional space, which results in a potential and unjustified windfall to Newell. Jenkins argues that Newell's "choice" to lease enhanced space should not sway this court. Jenkins would have this court accept the conclusion of the Nunnink appraisal.

The Fifth Amendment to the United States Constitution provides that it is fundamental constitutional law that private property shall not be taken or damaged for public use without just compensation. See K.S.A. 26-513(a). It is also the law of Kansas that, if the entire tract of land or interest therein is taken, the measure of compensation is the value of the property or interest at the time of the taking. K.S.A. 26-513(b).

In *State Highway Commission v. Safeway Stores*, 170 Kan. 413, Syl. ¶ 1, 226 P.2d 850 (1951), we stated:

"A tenant for years under a written lease is an 'owner' of property within the meaning of that term as used in our condemnation statutes and is entitled to compensation if his leasehold estate is damaged by the exercise of eminent domain."

See *Com'rs. of Smith Co. v. Labore*, 37 Kan. 480, 486, 15 Pac. 577 (1887).

In *Phillips Petroleum Co. v. Bradley*, 205 Kan. 242, 468 P.2d 95 (1970), we held that a condemnation award for property owned by several interests should be apportioned among those separate interests, stating:

"It has long been the rule that where leased property is taken by eminent domain, it is ordinarily valued as though held in a single ownership rather than by separately valuing the interests of the lessor and lessee, and the compensation for the property taken or damaged is apportioned by the district court between the lessor and lessee according to their respective interests." 205 Kan. at 247.

29A C.J.S., Eminent Domain § 190, p. 457 states:

"The lessor is entitled to compensation for injuries to his reversion, and the lessee for injuries to his leasehold interests. The lessee is entitled to the market value of the unexpired term of the lease less the present value of the rent called for by the lease. Where the leasehold is relatively long and rental values have substantially increased since the inception of the lease term, the lessee's share may exhaust the entire award. The lessor gets the present value of the rents plus the value of the remainder of the estate or the value of the fee less the award to the lessee."

In *Board of Sedgwick County Comm'rs v. Kiser Living Trust*, 250 Kan. 84, 92, 825 P.2d 130 (1992), the court stated the standard methods used in valuation of real estate in condemnation cases as

" '(a) the market data approach which is based upon what comparable properties had sold for; (b) the depreciated replacement cost or cost approach which is based upon what it would cost to acquire the land and to build equivalent improvements less depreciation; and (c) the income approach or capitalization of income which is based upon what the property is producing or is capable of producing in income.' " (Quoting *Ellis v. City of Kansas City*, 225 Kan. 168, Syl. ¶ 3, 589 P.2d 552 [1979].)

See *State Highway Commission v. Lee*, 207 Kan. 284, 485 P.2d 310 (1971).

In *Kiser,* the court also stated that the market data approach was

"the most common method of valuing real property and [that it] should be used when there have been sales of comparable properties in the same locale, near the time of the taking. When the property is so unique that there is no ascertainable market and there are no sales of reasonably similar or comparable property, the other methods—depreciated replacement cost approach or the income approach—may be used." 250 Kan. at 92.

The trial court has broad discretion in determining what other sales are comparable. *City of Shawnee v. Webb*, 236 Kan. 504, Syl. ¶ 4, 694 P.2d 896 (1985). With respect to condemnation of leasehold estates, we have held: "A lessee is an owner of the property and is entitled to just compensation if his leasehold is damaged from the exercise of eminent domain." *Kent*, 228 Kan. at 516. We have held that damages due a lessee for the taking of an entire leasehold are equal to the fair market value of the leasehold for the unexpired term of the lease. See *Miles v. City of Wichita*, 175 Kan. 723, Syl. ¶ 3, 267 P.2d 943 (1954).

In *Bales v. Railroad Co.*, 92 Kan. 771, 141 Pac. 1009 (1914), Bales occupied the condemned property held under the lease as a furniture store. The court stated:

"In awarding compensation to a lessee for a leasehold appropriated for railway uses, the market value of the unexpired term should be allowed, taking into consideration as elements of value the situation, condition and use made, or that may be made, of the premises, and the nature and prosperity of the business carried on there if it affects the value of the lease." 92 Kan. 771, Syl. ¶ 3.

The *Bales* court also held that the increased rental value of the premises caused by the addition by the tenant of decking, floor space, light plant, and fixtures was an element that could be considered by the jury in determining the value of the unexpired term. 92 Kan. 771, Syl. ¶ 1.

Here, the only issue before us on appeal is whether the district court used the proper method of valuation in distributing the condemnation award between Jenkins and Newell. We find that Jenkins' contention that the district court improperly used the substitute facilities method is without merit. Rather, the district court adopted Scroggin's valuation of Newell's leasehold estate and not that of Nunnink. Scroggin clearly testified that he performed a market data study of existing leaseholds, including the Olathe leasehold, to determine a market level of rent and that the Olathe leasehold was the most accurate for comparison purposes. Scroggin then performed an analysis to compare the contract rent of the Stanley lease to the market rent, abstracted the difference and abstracted it to present worth based upon an 8% discount rate. Scroggin clearly used the market data approach and not the substitute facilities approach.

Jenkins' argument that Scroggin and the district court failed to make any adjustment between the two leases to reflect the larger size of the Olathe lease and the better condition of the Olathe building also fails. Scroggin testified that he had factored in a percentage adjustment for these differences, and his conclusion was that the superior aspects of construction and condition of the Olathe property were offset by the superior nature of the Stanley location so that the net adjustment was zero. Although the district

court failed to make a specific finding regarding this adjustment, the court obviously accepted Scroggin's evaluation.

Jenkins' argument that the district court's and Scroggin's use of the Olathe lease as a comparable indicates that the district court relied on the substitute facilities method of valuation is also without merit. Scroggin used the Olathe lease because the rent was actually less than the rent of the Stanley leases used by Nunnink as comparables. In addition, it made no actual difference which leases were used as comparables since all the leases used were similar in size and rent.

We also reject Jenkins' next argument that the district court improperly relied upon the lack of availability of the Nunnink comparable leases at the time of the taking for a replacement location for the barber shop in deciding to exclude them as comparables. Although the district court referred to the "availability" of the Nunnink comparables to Newell, what the district court appears to have been emphasizing was that there were no leases in the Stanley area which were equivalent to Newell's lease irrespective of any time frame and that Newell's lease was unique. A trial court decision which reaches the right result will be upheld, even though the court may have relied upon the wrong reason or assigned erroneous reasons for its decision. *Bank of Kansas v. Davison*, 253 Kan. 780, 792, 861 P.2d 806 (1993).

Research has failed to reveal a case in which the tenant was forced to lease space larger than that occupied before the condemnation. However, the overriding consideration in distributing the condemnation award between a lessor and a lessee is the equitable and just compensation for "every sort of interest the citizen may possess" in the property taken. *U.S. v. General Motors Corp.*, 323 U.S. 373, 378, 89 L. Ed. 311, 65 S. Ct. 351 (1945). The approach favored by the district court which compensates Newell for the extra rent he was forced to pay due to the taking is more equitable than Jenkins' position which completely ignores Newell's loss in this regard.

It is apparent that the district court did not use the substitute facilities approach in determining its distribution of the condemnation award, but that it applied the market data approach.

The judgment of the district court is affirmed.

LOCKETT, J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.